UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
Roy Den Hollander

                      Plaintiff,

             -against-

United States of America,
Director of the U.S. Citizenship and Immigration Services
    (formerly Immigration and Naturalization Service)
    of the Department of Homeland Security, and
Director of the Executive Office for Immigration Review
    of the U.S. Department of Justice.

                    Defendants.
------------------------------------------------------------------------x

Docket No.
08 CV 01521(WHP)(ECF)

**COMPLAINT FOR
DECLARATORY RELIEF**

## I. Introduction and Summary

1. This action seeks a judgment declaring that certain provisions of the **Violence Against Women Act** ("VAWA"), the **Illegal Immigration Reform and Immigrant Responsibility Act** ("IIRIRA"), and the **Immigration and Nationality Act** ("INA") on their face, as applied, or their intended purposes, unconstitutionally abridged the plaintiff's rights to freedom of speech, freedom of choice in marital relationships, right of access to deportation proceedings, procedural due process, and equal protection under the law in violation of the First and Fifth Amendments to the United States Constitution.

2. The plaintiff's constitutional rights were violated by the statutorily created process by which the defendants ("Government") grant permanent U.S. residency to the alien wives (the terms "wives" and "wife" also refer to ex-wives and ex-wife) of U.S. citizen husbands (the terms "husbands" and "husband" also refer to ex-husbands and ex-husband) through a secretive "Star Chamber" type proceeding evoked solely on the unsubstantiated allegations by the alien wife that the citizen husband abused her.

3. While the process can also grant permanent residency to alien husbands of U.S. citizen wives, it is intended, geared toward, and overwhelmingly used by alien wives—aided by private feminist organizations—against U.S. citizen husbands.

4. The process as enacted into law was created by feminist organizations to provide alien wives alleging abuse a fast track to permanent residency by violating the Constitutional rights of citizen husbands.

5. The laws creating the process are bills of attainder meant to punish American men for going overseas to find wives.

6. Once an alien wife merely alleges abuse by a U.S. citizen husband, the IIRIRA, codified as 8 U.S.C. § 1367(a)(2), drops a curtain of secrecy over immigration proceedings by prohibiting the disclosure of any information to the U.S. citizen husband concerning allegations of and Government findings that he committed "battery" or "extreme cruelty" against his alien wife.

7. Behind the Star Chamber curtain, the alien wife, femininst advocates, and profit-driven immigration attorneys are free to submit irrelevant, untrustworthy, hearsay, character trait, and even fabricated information of criminal and non-criminal conduct by the U.S. citizen husband because there is no one to refute their statements nor attack their credibilty.

8. Virtually any lie, prevarication or dissemblance is used for showing "battery" or "extreme cruelty" under the Orwellian newspeak terminology "credible evidence" as set forth in 8 U.S.C. § 1154(a)(1)(J), 8 C.F.R. § 204.2(c)(1)(iv), 61 Fed. Reg. 13,066, and Virtue INS Memorandum, 76 Interpreter Releases 162, 168-169 (1999).

9. "Credible evidence" means whatever Government officials decide it to mean. Id.

10. The primary "credible evidence," and often times the only evidence, relied on by the U.S. Citizenship and Immigration Services ("USCIS") and the Executive Office for Immigration Review ("EOIR") in finding the citizen husband guilty[1] of "battery" and " extreme cruelty" is an affidavit by the alien wife that was prepared by her immigration attorney, which goes unchallenged as to her strong motive to lie in order to stay in America.

11. The U.S. citizen husband receives no notice of the Government proceedings that inevitably destroy his reputation and forever fix in Government records a false evil image of him that he had no opportunity to refute.

12. The Government records can be widely disseminated by his alien wife or self-interested feminists organization for which he will have no defamation, *prima facie* or false light causes of action in New York State.

13. In case the U.S. citizen husband happens to provide the USCIS or the EOIR with relevant, trustworthy, and non-hearsay evidence of the type admissible in a court of law that counters the alien wife's fabricate tales of "battery" and "extreme cruelty," the law requires officials to ignore the husband's evidence unless the Government acquires independent corroboration. 8 U.S.C. 1367(a)(1)(A), Virtue INS Memorandum, 74 Interpreter Releases 795 (1997).

14. While the labels "battery" and "extreme cruelty" evoke visions of Visigoth brutality, the standards used by the Government are so overbroad and unspecific as to include not just violent acts but also non-violent[2] and even acts of kindness.

---

[1] The word guilty means responsibility for a crime or responsibility for a civil wrong. Black's Law Dictionary, 8th ed. 1999.

[2] "Extreme cruelty" can include insulting an alien wife at home or in public. VAWA Manual for Immigration Relief for Abused Immigrants, Catholic Legal Immigration Network, pp.1-6 (2002).

2

15. The Government refuses to establish even a partial list of acts constituting "battery" and "extreme cruelty" for fear of "misinterpretation," 61 Fed. Reg. 13,061, 13,066, which opens the door to arbitrary decision making by the Government, something the Founding Fathers thought abhorrent.

16. The preferential treatment provided allegedly abused alien wives in derogation of the rights of U.S. husbands, and in the case of the plaintiff, occur throughout three procedures by which the alien wife acquires permanent residency: (1) self-petition, (2) cancellation of deportation proceeding, if such a proceeding is pending, and (3) adjustment of status.

## II.  The Alien Wife's Path to Permanent Residency

17. The path to permanent U.S. residency for an alien wife alleging domestic abuse by her citizen husband requires her to submit a "self-petition" for immediate relative classification pursuant to the VAWA, codified in 8 U.S.C. § 1154(a)(A)(iii).

18. In situations where the USCIS has already started deportation proceedings (euphemistically called "removal") against the alien wife, she will apply for cancellation of the deportation proceeding pursuant to the VAWA, codified in 8 U.S.C. §1229b(b)(2).

19. If the alien wife admitted to engaging in crimes of moral turpitude, such as tax evasion, or to previously working as a prostitute or procurer or in commercialized vice, the USCIS or EOIR will <u>not</u> deport her so long as she claims her conduct was connected to having been abused and deportation would cause her "extreme hardship."  <u>Id.</u>

20. The USCIS or EOIR will also cancel deportation proceedings of an alien wife claiming abuse even though she committed marriage fraud or made misrepresentations to gain admission to the U.S. if her acts were connected to having been abused and she claims deportation would cause her "extreme hardship."  VAWA, codified in 8 U.S.C. §§ 1229b(b)(2) & 1182(i).

21. "Extreme hardship" is an overbroad and vague standard that is left to officials of the USCIS and EOIR to decide.  It can include alleged psychological effects of the claimed abuse, or the alien wife's asserted need for social services available in America but not reasonably accessible in her home country, or even the husband's ability to travel to his wife's home country.

22. After cancellation of any deportation proceeding, the allegedly abused, alien wife will apply to change her status from a temporary resident to a permanent resident pursuant to the VAWA, codified in 8 U.S.C. § 1255(a).

## III.  Facts Pertaining to the Plaintiff.

23. In 2000, the plaintiff finished working in Moscow, Russia as Acting Manager of Kroll Associates' operations in the former Soviet Union.

3

24. In March, the plaintiff married Alina (a.k.a. Angelina) Alexandrovna Shipilina (a.k.a. Chipilina) in Krasnodar, Russia, a city of over one million, located near the Black Sea and about 300 miles from Chechnya. Ms. Shipilina uses the name "Angelina Shipilina" in her various occupations.

25. Ms. Shipilina received a temporary residency visa from the U.S. Embassy in Moscow in May 2000.

26. The plaintiff brought Ms. Shipilina to New York City in July 2000 where they lived as husband and wife.

27. Over the objections of the plaintiff, Ms. Shipilina began working as a lap dancer at the strip club Flash Dancers on Broadway in Times Square, New York City.

28. In August 2000, the plaintiff became suspicious of Ms. Shipilina's involvement in prostitution when she began secretly contacting Flash Dancers' customers.

29. At the time, Ms. Shipilina continued to secretly slip narcotics into the plaintiff's meals in order to deter him from learning about her hidden Russian and Chechen mafia activities and connections[3].

30. She had begun surreptitiously feeding the plaintiff narcotics months earlier so as to assure marriage to the plaintiff and entry into America. The U.S. Federal Bureau of Investigation tested the type of narcotics believed used but refused to provide the results to the plaintiff.

31. In October 2000, the plaintiff learned that Ms. Shipilina worked as a prostitute and had used her marriage to him to gain access to the lucrative sex market in America where a few hours of time returns the average monthly income of a family in Russia.

32. The plaintiff advised Ms. Shipilina to obtain counsel, since he was going to seek an annulment or a divorce.

33. At the end of October 2000, Ms. Shipilina's attorney advised the plaintiff to swear to a fraudulent affidavit for the USCIS (at that time the Immigration and Naturalization Service) that the marriage lasted longer than it did, Ms. Shipilina did not enter into the marriage to gain admission to the U.S., she was of good moral character, and the plaintiff would sponsor her for permanent residency. The plaintiff refused.

34. To pressure the plaintiff into signing a fraudulent affidavit and to fabricate an alternative means to permanent residency using the VAWA abused wife route, Ms. Shipilina filed a

---

[3] The plaintiff learned some time later from Russian Military Intelligence and other sources the extent of Ms. Shipilina's involvement in Russian and Chechen organized crime, which included her working as a mistress to the Chechen warlord Ruslan Labazanov when she was a teenager.

complaint with the 114th Police Precinct in Queens falsely stating the plaintiff had threaten her and tried to extort money from her.

35. In December 2000, Ms. Shipilina offered the plaintiff a monetary reward for complying with her attorney's request to provide a false affidavit to the USCIS in order for her to obtain permanent residency. The plaintiff refused.

36. On January 31, 2001, Ms. Shipilina obtained a temporary order of protection based on false testimony in an *ex parte* court proceeding at the Queens Family Court. The Order was dismissed for failure to prosecute in July 2001.

37. The Order falsely accused the plaintiff of aggravated harassment in the second degree, harassment in the first degree, harassment in the second degree, menacing in the second degree, menacing in the third degree, assault in the second degree, assault in the third degree, attempted assault, disorderly conduct, reckless endangerment, stalking in the first degree, stalking in the second degree, stalking in the third degree, and stalking in the fourth degree.

38. In February 2001, the plaintiff filed for an annulment or, alternatively, a divorce to which Ms. Shipilina's attorney responded with false accusations of the plaintiff beating his wife and the false accusation of extortion.

39. A divorce settlement was finalized without trial in December 2000 following a telephone threat to the plaintiff by a man, apparently an organized crime associate of Ms. Shipilina. The U.S. Federal Bureau of Investigation knows the identification of the threatener, but it has refused to provide his identification to the plaintiff, citing privacy concerns of the threatener.

40. The plaintiff provided evidence to the USCIS office at the U.S. Embassy in Moscow on some of Ms. Shipilina's violations of the Immigration and Nationality Act.

41. USCIS at the Embassy requested additional information for a deportation proceeding which the plaintiff provided with the result of two more threatening telephone calls to the plaintiff from the same individual that had threatened him into settling the annulment and divorce proceeding.

42. The purpose of the threatening calls was to prevent the plaintiff from providing further information to the USCIS for its deportation proceeding against Ms. Shipilina.

43. The plaintiff provided the USCIS over a period of time the following:
    a. 130 pages of Ms. Shipilina's handwritten diary;
    b. a private investigator's report confirming that Ms. Shipilina worked at the Limasol, Cyprus brothels "Zygos" and "Tramps" in 1999;
    c. a private investigator's affidavit that when Ms. Shipilina worked as a stripper at the "Gentlemen's Club" in Mexico City in 1999, the strippers engaged in prostitution;
    d. documents showing that Ms. Shipilina had been arrested at the Gentlemen's Club in Mexico City, jailed and deported under armed guard back to Russia in 1999;

5

  e. summaries of interviews with Ms. Shipilina's former Krasnodar procurer and her former Moscow procurer, both of whom confirmed she worked as a call girl;
  f. promotional clips from Ms. Shipilina's masturbation video that her former Moscow procurer produced and marketed;
  g. full frontal and back nude photographs that Ms. Shipilina's former Moscow procurer used to advertise her sexual services;
  h. two letters from Ms. Shipilina to her former Moscow procurer requesting work when she returned to Russia from Cyprus;
  i. summaries of interviews conducted by the plaintiff and his attorneys in Krasnodar and Moscow with various individuals who knew of Ms. Shipilina's prostitution;
  j. a partial list of Ms. Shipilina's prostitution clients in Cyprus, Mexico, and Italy for 1999 and 2000;
  k. Ms. Shipilina's work schedules at Flash Dancers;
  l. annulment and divorce proceeding documents that include Ms. Shipilina's perjured net worth statement and an income tax filing by which she evaded U.S. and New York State and City income taxes and lied about her occupation;
  m. summaries or transcripts of the threatening telephone calls received by the plaintiff;
  n. Ms. Shipilina's voter registration records on which she falsely swore to being a U.S. citizen; and
  o. referral letters and documents that the Commissioners of the New York City Board of Elections sent to the U.S. Attorney for the Eastern District of New York and the Queens District Attorney about Ms. Shipilina's Federal and State felony of falsely claming citizenship.

44. The plaintiff also offered the USCIS three affidavits by residents of Krasnodar attesting to Ms. Shipilina's prostitution prior to her receiving a U.S. visa.

45. The USCIS deportation proceedings against Ms. Shipilina charged, on information and belief:
    a. falsely claiming U.S. Citizenship in registering to vote,
    b. perjury in applying for a visa to live and work in America as a temporary resident,
    c. marriage fraud,
    d. prostitution,
    e. procuring,
    f. commercialized vice in the form of her masturbation video,
    g. income tax evasion,
    h. filing a fraudulent income tax return,
    i. prior arrest and imprisonment as a result of her deportation from Mexico,
    j. perjury before the New York State Supreme Court over her occupation and net worth in the annulment and divorce case,
    k. coercion and intimidation in arranging for the threatening telephone calls to the plaintiff, and
    l. tampering with a witness and obstructing the deportation proceeding by arranging for threats against the plaintiff to stop providing the USCIS with information.

46. While the information provided by the plaintiff to the USCIS was intended for the deportation proceeding, it should have been used to counter Ms. Shipilina's credibility and to call into question the veracity of the information provided by her, on information and belief, that the plaintiff allegedly "battered" and subjected her to "extreme cruelty."

47. Under 8 U.S.C. 1367(a)(1)(A), however, the USCIS and EOIR could not use any of the evidence provided by the plaintiff in Ms. Shipilina's VAWA proceedings because the plaintiff was the one who handed it over.

48. For example, because the plaintiff had provided the present sense impression evidence of Ms. Shipilina's diary, the USCIS and EOIR, on information and belief, ignored it in evaluating her credibility, but had Ms. Shipilina provided such as an exhibit to her affidavit, it would have been considered primary evidence, which, of course, she didn't because it would have assured her deportation.

49. Had the Constitution not been suspended for the plaintiff, the diary and other evidence he provided the USCIS would have countered the believability of Ms. Shipilina's allegations of "battery" and "extreme cruelty" by showing
    a. she registered to vote by swearing to be a U.S. citizen while still an alien;
    b. she committed marriage fraud in marrying the plaintiff so as to obtain entry into the U.S.;
    c. she worked for call girl operations in Moscow and Krasnodar, Russia;
    d. she work as a prostitute and stripper in brothels in Cyprus and Mexico City;
    e. she filed fraudulent income tax returns; and
    f. she lacked good moral character as shown by her arrest at a Mexican strip club and brothel and immediate deportation under guard from Mexico, her commercial masturbation video, her trying to procure females for a Mexico City strip club, her adultery, and her surreptitiously feeding the plaintiff narcotics.

50. In March 2007, the plaintiff came across a N.Y. Post article on the Internet from October 2006 about Ms. Shipilina working at the Hawaiian Tropic Zone restaurant in Times Square.

51. In order for Ms. Shipilina to legally work in the U.S., the deportation proceeding must have failed as a result of her using the VAWA process for "abused" alien wives to acquire permanent residency and the right to work in America.

52. The curtain of secrecy surrounding the VAWA process that Ms. Shipilina, on information and belief, used to obtained permanent residency and to work legally in America requires that some of the following factual allegations in this section be made "on information and belief."

53. On information and belief, the three steps by which Ms. Shipilina gained permanent residency based on false allegations against the plaintiff of "battery" and "extreme cruelty" consisted of
    a. self-petitioning for immediate relative classification pursuant to VAWA, 8 U.S.C. § 1154(a)(A)(iii);

7

      b. applying for cancellation of her deportation proceeding pursuant to VAWA, 8 U.S.C. §1229b(b)(2); and

      c. applying for adjustment of status to permanent resident pursuant to VAWA, 8 U.S.C. § 1255(a).

54. Any or all of the three steps may have resulted in appeals to the USCIS Administrative Appeals Office, the EOIR Immigration Courts or the EOIR Board of Immigration Appeals but because of the secrecy surrounding proceedings concerning VAWA alien wives, the plaintiff has not been able to determine whether any appeals were taken.

55. On information and belief, in the three steps to permanent residency, Ms. Shipilina submitted USCIS form I-360; her accompanying affidavit; personal testimony; her attorney's cover letter; statements or affidavits or testimony by others, including feminist counselors; and additional information allegedly demonstrating the plaintiff was guilty[4] of "battery" and "extreme cruelty."

56. On information and belief, the USCIS and EOIR created documents and records based solely on the information provided by Ms. Shipilina, her lawyer, and her feminist advocates, which information was not only false and misleading as to "battery" and "extreme cruelty" by the plaintiff, but was irrelevant, untrustworthy, unauthenticated, plagued by multiple hearsay, lacked credibility, and included character trait evidence.

57. On information and belief, anonymous USCIS and EOIR officials failed to ascertain the truth in making decisions that the plaintiff was guilty of "battery" and "extreme cruelty" because the decisions were based solely on the information provided by Ms. Shipilina, her lawyer, and her feminist advocates, which was not only false and misleading, but irrelevant, untrustworthy, unauthenticated, plagued with multiple hearsay, lacked credibility, and included character trait evidence.

58. On information and belief, the USCIS and EOIR's ignoring of the plaintiff's Constitutional rights calls into question the integrity of truth seeking functions in determining whether alien wives are actually abused.

59. In any proceedings by the USCIS and EOIR that found the plaintiff guilty of "battery" and "extreme cruelty," the plaintiff
      a. received no notice of the proceeding,
      b. had no opportunity to argue on his own behalf,
      c. could not present evidence or witnesses,
      d. could not confront and cross examine witnesses or evidence used against him, and
      e. received no written decision with a statement of the reasons for that decision or the weight provided the information on which the Government relied in reaching its decision.

---

[4] The extent of the wrong that the U.S. Government held the plaintiff responsible for is unknown, but the misrepresentations could conceivably extend from an insult to a loud argument to demanding an annulment to infliction of emotional distress without any physical manifestations to felony assault.

60. On information and belief, the anonymous decision makers in the USCIS and the EOIR proceedings who decided that the plaintiff committed "battery" and "extreme cruelty" on his alien wife could not have been neutral because they based their decisions on only one side of the story and were uninformed as to all the relevant facts which resulted in them making an arbitrary and erroneous decision.

### IV.  USCIS Vermont Service Center is biased against U.S. citizen husbands.

61. The Vermont Service Center for the USCIS has a small corps of officers that makes the Service's decisions concerning VAWA self-petitions, which means these officers decide whether a citizen husband committed "battery" or "extreme cruelty" against his alien wife.

62. The VAWA Unit for the Vermont Service Center has been unduly influenced by a special interest group biased against men and made up of a coalition of feminist organizations often funded by taxpayer dollars under the VAWA or granted tax exemption by the Internal Revenue Service.

63. On information and belief, some of the feminist organizations exerting undue influence on the VAWA Unit are A.I.S.T.A., Immigrant Legal Resource Center, Catholic Legal Immigration Network, National Immigration Project of the National Lawyers Guild, and the National Network on Behalf of Battered Immigrant Women.

64. Through administrative advocacy, training of VAWA officers, and provision of informational materials by private feminist organizations, feminist influence has reached such an extent that the VAWA Unit now operates as a virtual extension of the feminist special interest group by making decisions that largely further the group's anti-male agenda.

65. As Gail Pendleton of the National Immigration Project for the National Lawyers Guild says "The Vermont VAWA supervisors are extremely sympathetic to those applying …. [and] are adept at teaching adjudicators the errors of their ways, and appreciate hearing about problems occurring in the field."  The VAWA supervisors also "communicate regularly with VAWA advocates" and an immigration lawyer is "more likely to prevail swiftly with the VAWA supervisors at [the Vermont Service Center]…."  Applications for Immigration Status under the Violence Against Women Act, by Gail Pendleton and Ann Block, pp. 14, 16 (2001).

66. Ms. Pendleton also counsels immigration lawyers to contact the National Immigration Project "to discuss your legal arguments and a strategy for convincing Vermont you are right," id., and to contact the National Immigration Project if lawyers for alien wives are experiencing any "problems" with a local district office, id. at 17.

67. The National Immigration Project also provides legal advice to immigration lawyers for alien wives in the form of sample briefs and motions and is working to make certain "problem" USCIS districts more amendable to ruling in favor of alien wives by finding U.S. husbands guilty of "battery" and "extreme cruelty."  See Id. at 16.

68. Ms. Pendleton counsels that "practice pointers gleaned from working closely with both [USCIS] and numerous advocates for battered immigrants are essential sources of information on how to win VAWA cases." Id. at 27.

69. For example, the National Immigration Project advises immigration lawyers to move to suppress any information provided by an alien wife's U.S. husband. Id. at 16.

70. Ms. Pendleton also asserts about the EOIR that it is more "VAWA friendly" after receiving special training. Id. at 21.

71. The officials of the VAWA Unit at the Vermont Service Center have virtually unfettered discretion through the determination of the type and importance of information submitted to make decisions that further the feminist agenda of deterring American men from marrying foreign females through the threat of finding citizen husbands guilty of "battery" and "extreme cruelty" in secret VAWA self-petition proceedings.

72. The officials of the VAWA Unit also have the discretion to waive crimes of moral turpitude, prostitution, procuring and commercial vice committed by the allegedly abused alien wife, 8 U.S.C. § 1182(h)(1)(C); and to waive fraud and material misrepresentations made by the alien wife to gain entry into America, 8 U.S.C. § 1182(i).

## V.  VAWA, IIRIRA and INA provisions that infringed the plaintiff's constitutional rights.

Secrecy

73. Federal laws **8 U.S.C. § 1367(a)(2) & (c)** prohibit any employee of the Department of Justice, Department of Homeland Security, and Department of State from disclosing any information concerning proceedings involving the VAWA self-petitioning alien wife. The provisions are intended to conceal proceedings from the husband merely because he has been accused of "battery" and "extreme cruelty." Secrecy is maintained with respect to other individuals unless they fall within certain exceptions. A Government violator may face disciplinary action and a fine up to $5,000.

*Procedural Due Process*

74. On information and belief, the secrecy maintained by the USCIS and EOIR over its procedures by which Ms. Shipilina acquired permanent residency denied the plaintiff of procedural due process to refute accusations of "battery" and "extreme cruelty" and to at least have a shot at preventing administrative decisions that found him guilty of "battery" and "extreme cruelty."

75. On information and belief, the USCIS and EOIR's secrecy infringed the plaintiff's First Amendment right to speak by denying him any opportunity to be heard on his own behalf in order to counter accusations and prevent findings of "battery" and "extreme cruelty."

10

76. On information and belief, the statutory secrecy of the USCIS and EOIR infringed the plaintiff's First Amendment right of access to deportation proceedings by making it impossible for the plaintiff to determine if, when or where any proceedings would be held in which he would be charged and adjudged responsible for "battery" and "extreme cruelty."

77. On information and belief, the statutory secrecy used by the USCIS and EOIR abridged the plaintiff's right to freedom of choice in marital decisions by presenting him with a Faustian choice of perjury before the USCIS in sponsoring his wife for permanent residency or a Star Chamber proceeding by which the U.S. Government finds him guilty of "battery" and "extreme cruelty."

78. On information and belief, the behind closed-doors proceedings permitted the U.S. Government, Ms. Shipilina, and private feminist advocacy organizations to lie with impunity because there were no procedures by which the plaintiff could counter their falsehoods.

79. On information and belief, the secrecy provisions prevented the plaintiff from protecting his personal reputation because not only couldn't he determine what someone had said about him, but also who had said it.

80. In New York State, a defamation action requires that the exact words by pleaded.

81. Federal laws **8 U.S.C. § 1367(b)(2)(4) & (5)** allow information concerning the husband's "battery" and "extreme cruelty" to be disclosed to his alien wife; law enforcement officials; and private feminist organizations and Federal, State and local public agencies that provide benefits to alien wives if in the opinion of those organizations the husband abused the alien wife.

82. Any information concerning "battery" and "extreme cruelty" that is available to these groups will include the findings and decisions by the USCIS and EOIR as well as any information submitted by Ms. Shipilina, her immigration lawyer, and feminist counselors.

83. In the event that Ms. Shipilina or the private feminist organizations make any information available to the general public, the plaintiff would have no cause of action under the New York State law for defamation because the information was produced in an official proceeding of an administrative agency.

84. The plaintiff would also have no action for false light invasion of privacy because there are none in New York State unless the information was used for commercial purposes, and the plaintiff would have no *prima facie* tort action.

85. On information and belief, the secret proceedings that granted Ms. Shipilina permanent residency arbitrarily denied the plaintiff the right to institute a judicial action to correct inaccurate government records because the plaintiff is prohibited from accessing the records while the alien wife, her lawyer, private feminist groups and law enforcement officials aren't.

11

*Equal Protection – national origin*

86. On their face, the statutory provisions for secret proceedings do not apply to alien spouses but only apply to U.S. citizen spouses which is a violation of the equal protection rights under the Fifth Amendment accorded U.S. citizens.

87. On information and belief, the secret proceedings of the USCIS and EOIR invidiously discriminated against the plaintiff's national origin—America, because the secrecy of the proceedings applied only to him but not to Ms. Shipilina—a Russian.

*Equal Protection – sex*

88. The secrecy proceedings were intended and are overwhelmingly used for alien wives and not alien husbands; therefore, the statute as applied and in effect invidiously discriminates on the basis of sex against U.S. husbands.

89. On information and belief, the secret proceedings of the USCIS and EOIR violated the plaintiff's equal protection rights because the secrecy applied to him due to his sex; whereas, had he been an American female the entire VAWA process would most likely not have been evoked against the plaintiff, and if it had, it would likely have failed.

Turning a blind eye

90. Federal law **8 U.S.C. § 1367(a)(1)(A)** prohibits any employee of the Department of Justice, Department of Homeland Security, and Department of State from making an adverse determination of inadmissibility or deportability of a VAWA self-petitioning alien wife based solely on evidence provided by the U.S. citizen husband.

91. Evidence provided by a U.S. citizen husband cannot be used against an alien wife unless the USCIS or EOIR acquire independent corroboration from a third party unrelated to the husband.  Virtue Memorandum INS, 74 Interpreter Releases 795 (1997).

*Procedural Due Process*

92. On information and belief, the USCIS and EOIR violated the plaintiff's procedural due process rights by failing to take into account the deportation evidence provided by the plaintiff that called into question Ms. Shipilina's credibility on which the agencies relied for finding the plaintiff guilty of "battery" and "extreme cruelty."

93. On information and belief, the USCIS and EOIR infringed the plaintiff's freedom of speech by ignoring any of the deportation evidence submitted by him that would have countered statements by Ms. Shipilina about the plaintiff's alleged abuse by calling into question her credibility.

94. The statutory requirement of ignoring any evidence submitted by the plaintiff adverse to Ms. Shipilina, on information and belief, abridged the plaintiff's right to freedom of choice in

marital decisions because it left him with only the options to perjure himself before the USCIS in order to win Ms. Shipilina permanent residency or to have any evidence as to his innocence of "battery" and "extreme cruelty" discarded no matter how relevant, trustworthy, and credible.

95. Among the evidence that could have diminished Ms. Shipilina's credibility was a resolution by the Commissioners of the New York City Board of Elections that provided evidence to Federal and City prosecutors that Ms. Shipilina committed a Federal and State felony by falsely claiming U.S. citizenship when she registered to vote.

96. On information and belief, any evidence provided by the plaintiff that may have protected his personal reputation was ignored.

*Equal Protection – national origin*

97. Section **8 U.S.C. § 1367(a)(1)** on its face violates equal protection as incorporated into the Fifth Amendment by giving an alien's word credibility while discounting the believability of a U.S. citizen's statement. The unconstitutional classification is one of national origin: alien v. American.

98. On information and belief, the USCIS and EOIR violated the plaintiff's equal protection rights by believing statements and evidence provided by Ms. Shipilina while ignoring any statements or evidence from the plaintiff because of his national origin—America.

*Equal Protection - sex*

99. The discounting of evidence supplied by a U.S. citizen was intended and overwhelmingly occurs in cases involving alien wives; therefore, the statute as applied and in effect invidiously discriminates on the basis of sex against U.S. husbands.

100. Under the statute's evidentiary standard, the alien wife need only accuse her husband of "battery" or "extreme cruelty" and magically she doesn't have to disprove any evidence the husband may present to protect his reputation because his evidence is ignored unless the USCIS and EOIR decide to make the effort to find independent corroboration from a third party unconnected with the husband.

101. By contrast, the USCIS and EOIR will accept as primary proof of the alien wife's good moral character her own affidavit drafted by her immigration lawyer. 8 C.F.R. 204.2(c)(2)(v). There are no safeguards to assure a foreigner doesn't lie in order to win the valuable prizes of permanent U.S. residency and subsequently citizenship.

102. The USCIS and EOIR will also accept the alien wife's affidavit as primary proof without any corroborating evidence that a marriage was terminated as a result of the husband's "battery" or "extreme cruelty" as required by 8 U.S.C. § 1154(a)(1)(A)(iii)(II)(aa)(CC)(ccc) or that any absences from the country resulted from "battery" or "extreme cruelty" as required by 8 U.S.C. 1229b(b)(2)(B).

13

103. In determining whether the alien wife entered into marriage in good faith as required by 8 U.S.C. § 1154(a)(1)(A)(iii)(II)(aa), the USCIS and EOIR require a preponderance of the evidence, but since the only evidence the agencies typically consider comes from the alien wife, any statement she makes or information she provides will amount to a preponderance of the evidence regardless of its truth or falsity.

104. On information and belief, the USCIS and EOIR violated the plaintiff's equal protection rights by believing statements and evidence provided by Ms. Shipilina while ignoring any statements or evidence from the plaintiff because he was a man.

Relying on untrustworthy evidence

105. Federal law **8 U.S.C. § 1154(a)(1)(J)** allows the USCIS in granting self-petitions by alien wives to rely on irrelevant, untrustworthy, unauthenticated, multiple hearsay, uncontested, and character trait evidence and to give primary weight to the alien wife's affidavit without any corroborating facts.

106. Under the statute, the USCIS and EOIR reserve the power to arbitrarily decide the truth regardless of the relevance, competence, or credibility of the information provided by the allegedly abused alien wife. 8 C.F.R. 204.2(c)(2).

*Procedural Due Process*

107. On information and belief, the USCIS and EOIR in secret administrative proceedings violated the plaintiff's procedural due process rights under the Fifth Amendment by deciding the plaintiff was responsible for "battery" and "extreme cruelty" based on incompetent evidence, such as
    a. a temporary order of protection issued by the Queens Family Court in an *ex parte* judicial proceeding;
    b. an uninvestigated and unproven police complaint filed by Ms. Shipilina against the plaintiff at the 114th Police Precinct in Queens;
    c. an affidavit by Ms. Shipilina that the USCIS and EOIR primarily relied upon but which the plaintiff had no opportunity to refute;
    d. a cover letter by Ms. Shipilina's lawyer with unauthenticated documents as exhibits that the plaintiff had no opportunity to refute and were based on hearsay; and
    e. affidavits and statements from other individuals, including private feminist providers of benefits to allegedly abused wives, all of which the plaintiff had no opportunity to refute, were based on hearsay, included unauthenticated documents, or included character trait evidence.

108. Private feminist organizations exploit the lack of procedural due process controls on information harmful to the U.S. husband by suggesting to the alien wife that she use certain excuses acceptable to the USCIS and EOIR for not pursuing a temporary order of protection to final judgment, regardless of whether the excuse applies to her.

109. On information and belief, the USCIS and EOIR violated the plaintiff's procedural due process rights by accepting without corroboration one or all of the following excuses for Ms. Shipilina's failure to obtain a final order of protection against the plaintiff:
    a. the plaintiff threatened her if she pursued a final order,
    b. Ms. Shipilina didn't understand the law as explained to her in English, or
    c. the plaintiff promised to change.

110. Private feminist organizations exploit the lack of procedural due process controls on information against the U.S. husband by giving the alien wife acceptable excuses, regardless of the truth, for her marriage being of a short duration, such as blaming its brevity on the U.S. husband's "battery" and "extreme cruelty."

111. On information and belief, the USCIS and EOIR violated the plaintiff's procedural due process rights by accepting without corroboration Ms. Shipilina's assertions that her nine-month marriage to the plaintiff was so short because of his "battery" and "extreme cruelty."

112. On information and belief, the USCIS and EOIR infringed the plaintiff's freedom of speech, limited his freedom of choice in marital affairs, permitted the harming of his reputation by attributing to Ms. Shipilina the saintly virtue of truth telling.

*Equal Protection – national origin and sex*

113. The USCIS and EOIR's primary reliance on evidence submitted by alien spouses violates the equal protection of their U.S. spouses by invidiously discriminating against U.S. citizens based on their national origin—America.

114. The USCIS and EOIR's reliance on evidence submitted by alien spouses was intended by the statute and overwhelmingly occurs in cases involving alien wives; therefore, the statute as applied and in effect invidiously discriminates on the basis of sex against U.S. husbands.

115. On information and belief, the USCIS and EOIR violated the plaintiff's equal protection rights on two fronts: they found the plaintiff guilty of "battery" and "extreme cruelty" based on information they deemed relevant, competent, and credible because it was submitted by an alien and because the alien was female.

The standards for "battery," "extreme cruelty," and "overall pattern of violence" are void for vagueness and overbreath.

116. "Self-petitioning" under **8 U.S.C. § 1154(a)(1)(A)(iii)(I)(bb) & (II)(aa)(CC)(ccc)**, cancellation of removal under **8 U.S.C. § 1229b(b)(2)(A)(i) & (C)**, waiver of inadmissibility under **8 U.S.C. § 1182(h)(1)(C) & (i)**, waiver of deportation under **8 U.S.C. § 1227(a)(1)(H)(ii)**, non-disclosure of information under **8 U.S.C. § 1367(a)(2)**, prohibition on evidence from U.S. citizens under **8 U.S.C. § 1367(a)(1)(a)**, and definitions under **8 U.S.C. § 1641(c)(1)(A), 8 C.F.R. § 204.2(c)(1)(vi)** and **61 Fed. Reg. 13,061, 13,065-066** all require that the U.S. citizen husband engage in "battering" or "extreme cruelty."

15

117. None of the statutes, nor the Code of Federal Regulations, nor the Federal Registry explicitly define the phrase "was battered by or was the subject of extreme cruelty" or provide guidelines for determining what constitutes such actions outside of a few "egregious examples" and a warning that the agencies will know them when they see them, which allows USCIS and EOIR officials to determine "battery" and "extreme cruelty" on the basis of their personal preferences.

118. Under the regulations, "was battered by or was the subject of extreme cruelty" includes, but is not limited to, acts of "violence" or threatened acts of "violence" that result in physical or mental injury. Psychological "abuse" is considered "violence" as are "[o]ther abusive actions … that may not initially appear violent but are a part of an overall pattern of violence." 8 C.F.R. 204.2(c)(1)(vi).

119. In VAWA proceedings, the term "violence" has no dictionary meaning but is grab bag of any activity or speech with the only requirement that USCIS or EOIR officials say it is violence.

120. The Federal Register even admits the overbroad reach of the "flexible" concepts of "battery" and "extreme cruelty" by stating, "[i]t is not possible to cite all perpetrations that could be acts of violence under certain circumstances… [so] the rule does not itemize abusive acts other than those few particularly egregious examples." 61 Fed. Reg. 13,061, 13,066 (1996).

121. The USCIS and EOIR will even use non-battery and non-cruelty events and speech—also undefined—to "establish a pattern of abuse and violence and to bolster claims" that "battery" and "extreme cruelty" occurred. 61 Fed. Reg. 13,061, 13,066.

122. Under the vague and virtually boundless terms as used by the USCIS and EOIR, a citizen husband will be found by the Government to have "battered" or subjected to "extreme cruelty" his alien wife without any distinction among criminal wrongs, civil wrongs or conduct or speech that is neither but considered "offensive" based on the subjective sensitivities of members of the powerful special interest group that put those nebulous terms into the law in the first place—the feminists.

123. USCIS and EOIR officials, on information and belief, even include in "battered by or was the subject of extreme cruelty" a citizen husband insulting his alien wife at home or in public, arguing loudly with her, or engaging in some other undefined "inappropriate"[5] verbal communication.

124. The terms "battery" and "extreme cruelty" were intentionally left vague and over inclusive for their *in terrorem* effect on citizen husbands. The intent and impact was to domineer over virtually every aspect of a citizen husband's marital relationship with his alien wife by punishing him for acts that include Constitutionally protected speech he may use in

---

[5] By using "inappropriate", a very subjective term, the feminists apparently intend to appropriate the freedom of speech of anyone who disagrees with them.

16

times of quarrels and in times of making-up. It's an example of using political power to control the purely personal when no criminal or civil wrongs have occurred but only a failure to sacrifice liberty by not conforming to the self-righteous dictates of the feminist establishment.

125. The standards effectively deter or chill a citizen husband's freedom of speech by creating the threat that he may fall prey to zealot bureaucrats steeped in feminist dogma to remake man in the image desired by the feminists but not Mother Nature.

126. Because the terms "battery" and "extreme cruelty" as used in VAWA proceedings are so nebulous and expansive, they provide no clear guidance as to the nature of speech or conduct that may subject a citizen husband to a Star Chamber proceeding that violates his procedural due process and equal protection rights in finding him responsible for "battery" and "extreme cruelty."

127. Even the common law definition of battery as offensive touching does not sufficiently narrow that term as used by USCIS and EOIR officials because it could include anything from a citizen husband kissing his alien wife when she doesn't want to be kissed to felony assault. *See* 61 Fed. Reg. 13,061, 13,066.

128. The regulation 8 C.F.R. § 204.2(c)(1)(vi) and Federal Register 61 Fed. Reg. 13,061, 13,065-066 also fail to define or give guidelines for determining an "overall pattern of violence," whether physical or mental.

129. The nebulous and expansive statutory and regulatory standards for determining "battery," "extreme cruelty," or "overall pattern of violence" violate the First Amendment's Free Speech clause and the Due Process clause of the Fifth Amendment by being vague and overbroad and violate the Equal Protection part of Due Process by (1) burdening the freedom of speech of U.S. Citizens with alien spouses, but not U.S. Citizens with non-alien spouses and (2) burdening as intended and as applied the freedom of speech of U.S. husbands with alien wives but not U.S. wives with alien husbands.

130. On information and belief, officials of the USCIS and EOIR punished the plaintiff by using the vague and overbroad standards of "battery," "extreme cruelty," and "overall pattern of violence" to find him guilty of such, which violated his rights to free speech, procedural due process and equal protection.

Bills of attainder in violation Article 1, § 9, cl. 3 of the U.S. Constitution

131. Congress passed the above challenged statutes knowing that they would overwhelmingly punish an unpopular group—American men who look overseas for wives. Only rarely do American females go abroad for husbands.

132. The statutes punish American men by effectively limiting their freedom of choice to wives in America because marriage to and divorce from an alien wife makes any citizen husband susceptible to false allegations of "battery" and "extreme cruelty" without any Constitutional recourse to disprove those allegations.

17

133. When Congress passed the challenged statutes, the wording and legislative history shows an intent to apply the statutes against U.S. citizen husbands by repeatedly claiming Congress's purpose was to allow allegedly abused alien "women" a fast-track to permanent residency and ultimately to citizenship.

134. Congress's purpose in passing the challenged statutes was not to prevent citizen husbands from using the Immigration and Nationality Act to maintain power and control over their alien wives because those husbands, unless employees of the USCIS or EOIR or with hands across the White House, do not pull the levers of executive power.

135. The INA is administered by the Executive Branch of the Federal Government not by individual citizens married to or divorced from alien wives.

136. The objective of the challenged statutes is <u>not</u> to keep American men who are married to alien wives from subverting the administration of the INA, but to punish those men by violating their Constitutional rights to freedom of speech, freedom of choice in marital relationships, right of access to deportation proceedings, procedural due process, and equal protection under the law in violation of the First and Fifth Amendments to the United States Constitution.

137. Congress passed the statutes in order to placate the feminist lobby.

138. The entire process of obtaining VAWA permanent residency as created by the feminist lobby is geared toward punishing the American man by violating his Constitutional rights and ruining his reputation without the safeguards of judicial procedures merely on the say so of the alien wife and the feminist organizations that counsel her to allege "battery" and "extreme cruelty."

139. The amorphous nature of the terminology "battery," "extreme cruelty," and "overall pattern of violence" fail to provide a reasonable criteria by which a citizen man could conform his conduct in order to escape the application of the statutes to him and the ruining of his reputation and violation of his rights if he chose to bring a foreign wife home.

140. The Government's threat of unconstitutional punishment acts as a deterrent to any American man thinking of going overseas to find a wife; thereby, confining him to the pool of feminists and female allies of the feminists in America, which infringes his freedom of choice in marital affairs.

141. There are no other grounds for explaining the challenged statutes because an abused alien wife in America has recourse to the police, courts, and numerous legal aid groups to prevent abuse and avoid deportation without the need for a rubber stamp process to permanent residency that violates the Constitutional rights of her citizen husband.

142.   The USCIS and EOIR collaborate with private feminist groups providing benefits to allegedly abused alien wives and the immigration lawyers representing those wives to execute these bills of attainder against U.S. citizen husbands.

143.   The challenged statutes level a permanent proscription against any opportunity for an American husband to defend his innocence and to prevent the most powerful nation in the history of the world from adjudging him guilty of "battery" or "extreme cruelty."

144.   "Those who wrote the Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular … persons, because the legislature thinks them guilty of conduct which deserves punishment." United States v. Lovett, 328 U.S. 303, 317, 66 S. Ct. 1073, 90 L. Ed. 1252 (1946)(Mr. Justice Black who delivered the opinion of the Court).

## VI.  Defendants

145.   This action is against the United States of America and the Directors, solely in their official capacity, of the Department of Homeland Security's U.S. Citizenship and Immigration Services (formerly Immigration and Naturalization Service), and the U.S. Department of Justice's Executive Office for Immigration Review.

## VII.  Sovereign Immunity

146.   This action falls within an exception to sovereign immunity because it alleges as unconstitutional various statutory powers exercised by the USCIS and EOIR.

## VIII.  Subject Matter Jurisdiction

147.   This Court has subject matter jurisdiction over this action under 28 U.S.C. 1331 for civil actions arising under the U.S. Constitution.

## IX.  Personal Jurisdiction

148.   This Court has personal jurisdiction over the defendants in accordance with Fed. R. Civ. P. 4(i)(1).

## X.  Venue

149.   This Court has venue under 28 U.S.C. 1391(e) because the plaintiff is a resident of New York, New York and no real property is involved.

## XI.  Conclusion

150.   As the law created by feminist lobbying now stands, alien females prone to criminal pursuits can become permanent residents and eventually U.S. citizens by simply saying their American husbands abused them, and it will not matter that these females are lying,

committed crimes of moral turpitude, violated drug laws, worked as prostitutes and procurers, or used fraud and perjury to gain entry into the U.S. and to stay here.

151.    In practice and intent, the Violence Against Women Act and certain sections of the Illegal Immigration Reform and Immigrant Responsibility Act and Immigration and Nationality Act create a process by which the Constitutional rights of American men who take or consider taking foreign wives are violated in order to rectify the feminists inability to make American men love them.


Dated: February 14, 2008
       New York, N.Y.

/S/

_____
Roy Den Hollander, Esq. (1957)
Attorney and plaintiff
545 East 14 Street, 10D
New York, N.Y. 10009
(917) 687-0652