UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
Roy Den Hollander, Sean Moffett, Bruce Cardozo, and
David Brannon,

                Plaintiffs on behalf of themselves
                and all others similarly situated,

              -against-

Secretary Michael Chertoff U.S. Dept. Homeland Security,
Director Emilio Gonzales U.S. Citizenship and Immigration Services
        (formerly Immigration and Naturalization Service),
U.S. Attorney General Michael B. Mukasey,
Director Kevin Ohlson Executive Office for Immigration Review
        U.S. Department of Justice,

              Defendants.
------------------------------------------------------------------------x

Docket No.
08 CV 01521(WHP)(ECF)

**FIRST AMENDED CLASS
ACTION CIVIL RIGHTS
COMPLAINT**

## I.  Introduction and Summary

1.  This action seeks declaratory and injunctive relief and nominal damages against the defendants for violations of the constitutional rights of the members of the plaintiff class.

2.  The defendants violated and continue to violate the class members' rights by enforcing certain provisions of the **Violence Against Women Act** ("VAWA"), the **Illegal Immigration Reform and Immigrant Responsibility Ac**t ("IIRIRA"), and the **Immigration and Nationality Act** ("INA").  The specific statutory provisions are in bold.

3.  The provisions—either on their face, as applied, or their intended purposes— unconstitutionally abridged and continue to abridge the class members' rights to freedom of speech, right to privacy, freedom of choice in marital relationships, right of access to deportation proceedings, procedural due process, and equal protection under the law in violation of the First and Fifth Amendments to the United States Constitution.

4.  The class members' constitutional rights were and are being violated by the statutorily created process in which the defendants grant permanent U.S. residency to the alien wives (the terms "wives" and "wife" also refer to ex-wives and ex-wife) of U.S. citizen husbands (the terms "husbands" and "husband" also refer to ex-husbands and ex-husband) through a secretive law enforcement "Star Chamber" type proceeding evoked solely on the unsubstantiated allegations by the alien wife that her citizen husband abused her.

5.  While the process can also grant permanent residency to alien husbands of U.S. citizen wives, it is intended, geared toward, and overwhelmingly used by alien wives—aided by private feminist advocacy organizations—against U.S. citizen husbands.

6.  The process as enacted into law was created by feminist organizations to provide alien wives alleging abuse a fast track to permanent residency by violating the U.S. Constitutional rights of citizen husbands.

7.  The laws creating the process are bills of attainder meant to punish American men for going overseas to find wives and to deter them from doing so.

8.  While the unconstitutional statutory provisions do not provide *de jure* penalties, they have and continue to cause *de facto* harm to members of the plaintiff case.

9.  The statutory provisions encourage and cause alien wives to engage in criminal fraud, criminal deceit, perjury, extortion, and coercion against their citizen husbands because the provisions eliminate the traditional deterrents to such conduct embodied in the adversarial process, the reliability requirements for evidence, and the specific definitions of the conduct prohibited when finding a U.S. citizen husband responsible for abuse.

10. Alien wives, their lawyers, and various feminist advocacy groups exploit the lack of traditional safeguards for ascertaining the truth by creating public records permeated with fraud prior to evoking the Federal Government's process for rewarding alien wives with the valuable prize of permanent residency.

11. The alien wives of class members have and continue to manufacture public records of alleged abuse by their U.S. husbands so that those records will be relied upon by the defendants to find husbands responsible for abuse.  Such records include an alien wife:

    a.  Making false allegations of abuse to obtain an *ex parte* temporary order of protection—no permanent order required by the defendants;
    b.  Falsely claiming or intentionally causing the violation of a temporary or permanent protection order in order to have the U.S. husband arrested—no final adjudication required by the defendants;
    c.  Making false accusations of domestic violence to the police that often require the police to arrest the husband—no conviction required by the defendants;
    d.  Faking minor injuries—no judicial decision on who caused the injuries required by the defendants;
    e.  Filing various complaints with the police that falsely accuse the U.S. husband of any number of crimes—no conviction required by the defendants;
    f.  Making false statements to government social service agencies—no investigation or hearing required by the defendants; and
    g.  Responding to leading questions from social workers for Federally funded feminist advocacy groups in order to make out a fraudulent *prima facie* case for permanent residency.

12. These records harm a husband's reputation, honor and integrity with false statements and with respect to non-false matters reveal intimate private conduct that injures a husband's privacy interest.

13. When an alien wife, her lawyer, and feminist advocacy group invoke the permanent residency process, the mere allegation of abuse, causes the defendants, under IIRIRA, codified as **8 U.S.C. § 1367(a)(2)**, to drop a curtain of secrecy over all immigration proceedings by prohibiting the disclosure of any information to the U.S. citizen husband concerning allegations of and the defendants' findings of fact that the husband committed "battery," "extreme cruelty," or engaged in an "overall pattern of violence" against his alien wife.

14. These proceedings, considered law enforcement by the Justice Department, are kept secret from the very person against whom findings of facts of abuse are made—the U.S. husband.

15. Behind the Star Chamber curtain, the alien wife, feminist advocates, and profit-driven immigration attorneys are free to submit fabricated, irrelevant, untrustworthy, hearsay, and character trait information of criminal, no convictions required, and non-criminal conduct by the U.S. husband because there is no one to refute their statements nor attack their credibilty.

16. Virtually any lie, prevarication or dissemblance is used for showing "battery," "extreme cruelty," or "overall pattern of violence" under the Orwellian newspeak terminology "credible evidence" as set forth in **8 U.S.C. § 1154(a)(1)(J), 8 C.F.R. § 204.2(c)(1)(iv), 61 Fed. Reg. 13,066**, and <u>Virtue INS Memorandum</u>, 76 Interpreter Releases 162, 168-169 (1999).

17. In the end, "credible evidence" means whatever the defendants decide it to mean.  <u>Id.</u>

18. The primary "credible evidence," and often times the only evidence, relied on by the U.S. Citizenship and Immigration Services ("USCIS") and the Executive Office for Immigration Review ("EOIR") in finding the citizen husband guilty[1] of "battery," "extreme cruelty," or "overall pattern of violence" is an affidavit by the alien wife that was prepared by her immigration attorney in accordance with suggestions from feminist advocacy groups.

19. The affidavit goes unchallenged as to her strong motive to lie in order to stay in America.

20. The citizen husband receives no notice of the Federal Government ("Government") proceedings, nor opportunity to participate, nor opportunity to refute allegations and findings in those proceedings that invade his right to privacy in areas such as marriage, procreation, contraception, family relationships, and child rearing.

21. The defendants' findings of fact create a ticking time bomb for the continuing invasion of the citizen husband's privacy rights and the destruction of his reputation, honor, or integrity and

---

[1] The word guilty means responsibility for a crime or responsibility for a civil wrong.  <u>Black's Law Dictionary</u>, 8th ed. 1999.

forever fix in Government records a false evil image of him that he has no opportunity to refute or correct.

22. These findings of fact are not locked away with the Ark of the Covenant from the first Indian Jones movie.  They are readily available to the alien wife, self-interested feminists organizations, or governments, and there are no procedures afforded class members to challenge the release of such findings of facts and decisions.

23. Such availability creates an ever present threat that the falsehoods and privacy information in the findings will be used in a manner injurious to a class member's reputation, honor, or integrity and expose intimate privacy information for which he will have no cause of action to correct the harm done.

24. Anticipation of this future harm is in itself a present and continuing harm.

25. When the proceedings result in granting the alien wife permanent residency, the U.S. citizen husband, even though divorced from the alien, continues to be financially responsible for the alien wife under an "affidavit of support" to the extent of 125 per cent of the federal poverty level until she becomes a U.S. citizen or has worked for 10 years in accordance with 8 USC 1183a(a).

26. In case the U.S. citizen husband happens to provide the defendants with relevant, trustworthy, and non-hearsay evidence of the type admissible in a court of law that counters the alien wife's fabricate tales of "battery," "extreme cruelty," or "overall pattern of violence"; the law requires officials to ignore the husband's evidence unless the Government acquires independent corroboration.  **8 U.S.C. 1367(a)(1)(A)**, Virtue INS Memorandum, 74 Interpreter Releases 795 (1997).

27. While the labels "battery," "extreme cruelty," and "overall pattern of violence" evoke visions of Visigoth brutality, the guidelines used by the defendants to find such are so expansive and unspecific as to constitute no guidelines at all.  They can include not just violent acts but also non-violent[2] and even acts of kindness.

28. The defendants refuse to establish even a partial list of acts constituting "battery," "extreme cruelty," and "overall pattern of violence" for fear of "misinterpretation," **61 Fed. Reg. 13,061, 13,066,** which, of course, opens the door to arbitrary decision making by the defendants, something the Founding Fathers thought abhorrent.

29. The process for granting permanent residency to alien wives alleging abuse has violated, continues to violate, and threatens to violate the constitutional rights of class members.

30. The process casts a continuing and brooding presence of risk and fear that threatens an American man's right to marry a foreign female when the high failure rate of marriages and the intense desire of aliens to gain admittance to the U.S. are considered.

---

[2] "Extreme cruelty" can include insulting an alien wife at home or in public.  VAWA Manual for Immigration Relief for Abused Immigrants, Catholic Legal Immigration Network, pp.1-6 (2002).

31. The preferential treatment provided allegedly abused alien wives in derogation of the rights of U.S. husbands occur throughout three procedures by which an alien wife may acquire permanent residency: (1) self-petition, (2) cancellation of deportation proceeding, if such a proceeding is pending, and (3) adjustment of status.

## II.  The alien wife's path to permanent residency

32. The path to permanent U.S. residency for an alien wife alleging domestic abuse by her citizen husband requires her to submit a "self-petition" for immediate relative classification pursuant to VAWA, codified in 8 U.S.C. § 1154(a)(1)(A)(iii).

33. In situations where the USCIS has already started deportation proceedings (euphemistically called "removal") against the alien wife, she will apply for cancellation of the deportation proceeding pursuant to VAWA, codified in 8 U.S.C. §1229b(b)(2).

34. If the alien wife admitted to engaging in crimes of moral turpitude, such as tax evasion, or to previously working as a prostitute or procurer or in commercialized vice, the defendants will not deport her so long as she claims her conduct was connected to having been abused and deportation would cause her "extreme hardship." Id.

35. The defendants will also cancel deportation proceedings of an alien wife claiming abuse even though she committed marriage fraud or made misrepresentations to gain admission to the U.S. if her acts were connected to having been abused and she claims deportation would cause her "extreme hardship." VAWA, codified in 8 U.S.C. §§ 1229b(b)(2) & 1182(i).

36. "Extreme hardship" is an overbroad and vague standard that is left to the defendants to decide. It can include alleged psychological effects of the claimed abuse, or the alien wife's asserted need for social services available in America but not reasonably accessible in her home country, or even the husband's ability to travel to his wife's home country.

37. After cancellation of any deportation proceeding, the allegedly abused, alien wife will apply to change her status from a temporary resident to a permanent resident pursuant to the VAWA, codified in 8 U.S.C. § 1255(a).

38. Three years after receiving permanent residency, an alien wife can apply for U.S. citizenship while the normal wait for others is five years.

39. This three and at times two-steps to permanent residency by alien wives is referred to in this complaint as the VAWA process or VAWA proceedings.

## III.  Plaintiff Class

40. There are questions of law and fact presented in this action that are common to the entire class and that affect the rights of the class.

41. This class action is maintainable under Fed. R. Civ. P. § 23(b)(2) because the defendants have acted on grounds generally applicable to the class, thereby making declaratory and injunctive relief and nominal damages appropriate to the class as a whole.

42. The defendants are responsible under federal law for administering the various statutes claimed to be unconstitutional that allow alien wives who marry U.S. citizen husbands to obtain permanent residency by accusing their husbands of "battery," "extreme cruelty," or an "overall pattern of violence."

43. The putative class in this action consists of all U.S. citizen men who have taken or will take a foreign wife, successfully sponsor or will sponsor her for temporary residency, and the wife obtains or will obtain permanent residency status through the process of accusing her husband of "battery," "extreme cruelty," or an "overall pattern of violence."

44. The exact number of members of the class is not known, but it is estimated to be too large for joinder of all members to be impractical.

45. The three federal procedures by which the class members' constitutional rights are violated are:
    a. self-petitioning for immediate relative classification pursuant to VAWA, 8 U.S.C. § 1154(a)(A)(iii);
    b. applying for cancellation of any pending deportation proceeding pursuant to VAWA, 8 U.S.C. §1229b(b)(2); and
    c. applying for adjustment of status to permanent residency pursuant to VAWA, 8 U.S.C. § 1255(a).

46. Any or all of the three steps may result in appeals to the USCIS Administrative Appeals Office, the EOIR Immigration Courts, or the EOIR Board of Immigration Appeals, but because of the secrecy surrounding proceedings concerning VAWA alien wives, class members cannot determine with certainty whether appeals are taken.

47. In the two or three steps to permanent residency, the alien wife submits USCIS form I-360; her accompanying affidavit; personal testimony; her attorney's cover letter; statements or affidavits or testimony by others, including feminist counselors; and additional information allegedly demonstrating the class member is guilty of "battery," "extreme cruelty," or "overall pattern of violence."

48. The defendants create documents and records based solely on the information provided by the VAWA alien wife, her lawyer, and her feminist advocates, which information is often not only false and misleading as to "battery," "extreme cruelty," or "overall pattern of violence," but is often irrelevant, untrustworthy, unauthenticated, plagued by multiple hearsay, lacking in credibility, and including character trait evidence.

49. Anonymous USCIS and EOIR officials often fail to ascertain the truth in making decisions that a class member is guilty of "battery," "extreme cruelty," or "overall pattern of violence" because the decisions are based solely on the information provided by the alien wife, her

lawyer, and her feminist advocates, which is not only often false and misleading, but irrelevant, untrustworthy, unauthenticated, plagued with multiple hearsay, lacking in credibility, and including character trait evidence.

50. The defendants' ignoring of a class member's Constitutional rights by applying the statutes calls into question the integrity of the truth seeking functions in determining whether alien wives are actually abused.

51. In any proceedings by the defendants that finds a class member guilty of "battery," "extreme cruelty," or "overall pattern of violence," the class member
    a. receives no notice of the proceeding,
    b. has no opportunity to argue on his own behalf,
    c. can not present evidence or witnesses,
    d. can not confront and cross examine witnesses or evidence against him, and
    e. receives no written decision with a statement of the reasons for that decision or the weight provided the information on which the defendants relied in reaching their decision.

52. The anonymous decision makers in the USCIS and the EOIR who decide that a class member committed "battery," "extreme cruelty," or an "overall pattern of violence" on his alien wife are not neutral because they base their decisions on only one side of the story and are uninformed as to all the relevant facts which results in them making arbitrary and erroneous decisions.

## IV.  Facts pertaining to the named plaintiffs.

### Roy Den Hollander

53. Roy Den Hollander, counsel for the putative class and co-named plaintiff or co-class representative, individually and on behalf of all the others similarly situated, both past, present and future, challenges the constitutionality of the statutes and regulations listed in bold in this complaint and the application of those statutes and regulations to the members of the plaintiff class.

54. Mr. Den Hollander is an attorney admitted to practice in New York State, the U.S. District Courts for the Southern and the Eastern Districts of N.Y., and the Second Circuit, a former litigation associate at Cravath, Swaine & Moore, and is able to conduct this litigation fairly and adequately to protect the interests of the putative class.

55. The claims of Mr. Den Hollander arise out of the same unconstitutional procedures and course of conduct by the defendants and are based on the same legal theories as for the entire class.

56. In 2000, Mr. Den Hollander finished working in Moscow, Russia as Acting Manager of Kroll Associates' operations in the former Soviet Union.

57. In March 2000, Mr. Den Hollander married Alina (a.k.a. Angelina) Alexandrovna Shipilina (a.k.a. Chipilina) in Krasnodar, Russia, a city of over one million, located near the Black Sea and about 300 miles from Chechnya. Ms. Shipilina uses the name "Angelina Shipilina" in her various occupations.

58. Ms. Shipilina received a temporary residency visa from the U.S. Embassy in Moscow in May 2000.

59. Mr. Den Hollander brought Ms. Shipilina to New York City in July 2000 where they lived as husband and wife.

60. Over the objections of Mr. Den Hollander, Ms. Shipilina began working as a lap dancer at the strip club Flash Dancers on Broadway in Times Square, New York City.

61. In August 2000, Mr. Den Hollander became suspicious of Ms. Shipilina's involvement in prostitution when she began secretly contacting Flash Dancers' customers.

62. At the time, Ms. Shipilina continued to secretly slip narcotics into Mr. Den Hollander's meals in order to deter him from learning about her hidden Russian and Chechen mafia activities and connections[3].

63. She had begun surreptitiously feeding Mr. Den Hollander narcotics months earlier so as to assure marriage to him and entry into America. The U.S. Federal Bureau of Investigation tested the type of narcotics believed used but refused to provide the results to him.

64. In October 2000, Mr. Den Hollander learned that Ms. Shipilina worked as a prostitute and had used her marriage to him to gain access to the lucrative sex market in America where a few hours of time returns the average monthly income of a family in Russia.

65. Mr. Den Hollander advised Ms. Shipilina to obtain counsel, since he was going to seek an annulment or a divorce.

66. At the end of October 2000, Ms. Shipilina's attorney advised Mr. Den Hollander to swear to a fraudulent affidavit for the USCIS (at that time the Immigration and Naturalization Service) that the marriage lasted longer than it did, Ms. Shipilina did not enter into the marriage to gain admission to the U.S., she was of good moral character, and he would sponsor her for permanent residency. Mr. Den Hollander refused.

67. To pressure Mr. Den Hollander into signing a fraudulent affidavit and, on information and belief, to fabricate an alternative means to permanent residency using the VAWA abused

---

[3] Mr. Den Hollander learned some time later from Russian Military Intelligence and other sources the extent of Ms. Shipilina's involvement in Russian and Chechen organized crime, which included her working as a mistress to the Chechen warlord Ruslan Labazanov.

wife route, Ms. Shipilina filed a complaint with the 114th Police Precinct in Queens falsely stating Mr. Den Hollander had threaten her and tried to extort money from her.

68. In December 2000, Ms. Shipilina offered Mr. Den Hollander a monetary reward for complying with her attorney's request to provide a false affidavit to the USCIS in order to ease her obtaining permanent residency. Mr. Den Hollander refused.

69. On January 31, 2001, Ms. Shipilina obtained a temporary order of protection based on false testimony in an *ex parte* court proceeding at the Queens Family Court, which required Mr. Den Hollander to retain counsel. The Order was dismissed for failure to prosecute in July 2001.

70. The Order falsely accused Mr. Den Hollander of aggravated harassment in the second degree, harassment in the first degree, harassment in the second degree, menacing in the second degree, menacing in the third degree, assault in the second degree, assault in the third degree, attempted assault, disorderly conduct, reckless endangerment, stalking in the first degree, stalking in the second degree, stalking in the third degree, and stalking in the fourth degree.

71. In February 2001, Mr. Den Hollander on advice of counsel filed for an annulment or, alternatively, a divorce to which Ms. Shipilina's attorney responded with false accusations of Mr. Den Hollander beating his wife and extortion.

72. A divorce settlement was finalized without trial in December 2000 following a telephone threat to Mr. Den Hollander by a man, apparently an organized crime associate of Ms. Shipilina. The U.S. Federal Bureau of Investigation knows the identification of the threatener, but it has refused to provide his identification to Mr. Den Hollander, citing privacy concerns of the threatener.

73. Mr. Den Hollander provided evidence to the USCIS office at the U.S. Embassy in Moscow on some of Ms. Shipilina's violations of the Immigration and Nationality Act ("INA").

74. USCIS at the Embassy requested additional information for a deportation proceeding which Mr. Den Hollander provided with the result of two more threatening telephone calls to him from the same individual that had threatened him into settling the annulment and divorce proceeding.

75. The purpose of the threatening calls was to prevent Mr. Den Hollander from providing further information to the USCIS for its deportation proceeding against Ms. Shipilina.

76. Mr. Den Hollander provided the USCIS over a period of time the following:
   a. 130 pages of Ms. Shipilina's handwritten diary;
   b. a private investigator's report confirming that Ms. Shipilina worked at the Limasol, Cyprus brothels "Zygos" and "Tramps" in 1999, prior to admission to the U.S.;

c. a private investigator's affidavit that when Ms. Shipilina worked as a stripper at the "Gentlemen's Club" in Mexico City in 1999, the strippers engaged in prostitution, also prior to her admission to the U.S.;

d. documents showing that Ms. Shipilina had been arrested at the Gentlemen's Club in Mexico City, jailed and deported under armed guard back to Russia in 1999;

e. summaries of interviews with Ms. Shipilina's former Krasnodar procurer and her former Moscow procurer, both of whom confirmed she worked as a call girl prior to her admission to the U.S.;

f. promotional clips from Ms. Shipilina's masturbation video that her former Moscow procurer produced and marketed;

g. full frontal and back nude photographs that Ms. Shipilina's former Moscow procurer used to advertise her sexual services;

h. two letters from Ms. Shipilina to her former Moscow procurer requesting work when she returned to Russia from Cyprus;

i. summaries of interviews conducted by the named-plaintiff and his attorneys in Krasnodar and Moscow with various individuals who knew of Ms. Shipilina's prostitution both before and after her admission to the U.S.;

j. a partial list of Ms. Shipilina's prostitution clients in Cyprus, Mexico, and Italy for 1999 and 2000;

k. Ms. Shipilina's work schedules at Flash Dancers;

l. annulment and divorce proceeding documents that include Ms. Shipilina's perjured net worth statement and an income tax filing by which she evaded U.S. and New York State and City income taxes and lied about her occupation;

m. summaries or transcripts of the threatening telephone calls received by Mr. Den Hollander;

n. Ms. Shipilina's voter registration records on which she falsely swore to being a U.S. citizen; and

o. referral letters and documents that the Commissioners of the New York City Board of Elections sent to the U.S. Attorney for the Eastern District of New York and the Queens District Attorney about Ms. Shipilina's Federal and State felonies in falsely claming citizenship.

77. Mr. Den Hollander also offered the USCIS three affidavits by residents of Krasnodar attesting to Ms. Shipilina's prostitution prior to her receiving a U.S. visa.

78. The USCIS deportation proceedings against Ms. Shipilina charged, on information and belief:

a. falsely claiming U.S. Citizenship in registering to vote,

b. perjury in applying for a visa to live and work in America as a temporary resident,

c. marriage fraud,

d. prostitution,

e. procuring,

f. commercialized vice in the form of her masturbation video,

g. income tax evasion,

h. filing a fraudulent income tax return,

i. prior arrest and imprisonment stemming from her deportation from Mexico,

> j.  perjury before the New York State Supreme Court over her occupation and net worth in the annulment and divorce case,
>
> k.  coercion and intimidation in arranging for the threatening telephone calls to Mr. Den Hollander, and
>
> l.  tampering with a witness and obstructing the deportation proceeding by arranging for threats against Mr. Den Hollander to stop providing the USCIS with information.

79. While the information provided by Mr. Den Hollander to the USCIS was intended for the deportation proceeding, on information and belief, it should have been or should be used to counter Ms. Shipilina's credibility and to call into question the veracity of the information provided by her or to be provided by her that Mr. Den Hollander allegedly "battered" and subjected her to "extreme cruelty" and engaged in an "overall pattern of violence."

80. Under **8 U.S.C. 1367(a)(1)(A)**, however, the defendants cannot use any of the evidence provided by Mr. Den Hollander in any VAWA proceedings brought by Ms. Shipilina because he is the one who handed it over.

81. For example, because Mr. Den Hollander provided the present sense impression evidence of Ms. Shipilina's diary, the defendants, on information and belief, ignored or will ignore it in evaluating her credibility, but were Ms. Shipilina to provide such as an exhibit to her affidavit, it would be considered primary evidence, which, of course, she didn't or won't because it would assure her deportation.

82. On information and belief, were the Constitution not suspended for Mr. Den Hollander, the diary and other evidence he provided the USCIS would counter the believability of any of Ms. Shipilina's allegations of "battery," "extreme cruelty," or "overall pattern of violence" by showing

> a.  she registered to vote by swearing to be a U.S. citizen while still an alien;
>
> b.  she committed marriage fraud in marrying Mr. Den Hollander so as to obtain entry into the U.S.;
>
> c.  she worked for call girl operations in Moscow and Krasnodar, Russia;
>
> d.  she work as a prostitute and stripper in brothels in Cyprus and Mexico City;
>
> e.  she filed fraudulent income tax returns; and
>
> f.  she lacked good moral character as shown by her arrest at a Mexican strip club and brothel and immediate deportation under guard from Mexico, her commercial masturbation video, her trying to procure females for a Mexico City strip club, her adultery, and her surreptitiously feeding Mr. Den Hollander narcotics.

83. In March 2007, Mr. Den Hollander came across a N.Y. Post article on the Internet from October 2006 about Ms. Shipilina working at the Hawaiian Tropic Zone restaurant in Times Square.

84. On information and belief, for Ms. Shipilina to be legally working at the restaurant, she must have used or is using the VAWA process to acquire permanent residency.

<u>Sean Moffett</u>

85. Sean Moffett, co-named plaintiff or co-class representative, individually and on behalf of all the others similarly situated, both past, present and future, challenges the constitutionality of the statutes and regulations listed in bold in this complaint and the application of those statutes and regulations to the members of the plaintiff class.

86. The claims of Mr. Moffett arise out of the same unconstitutional procedures and course of conduct by the defendants and are based on the same legal theories as for the entire class.

87. Mr. Moffett lives in St. Paul, Minnesota. He met his future alien wife in November 2004. She came to America from Guatemala on a tourist visa.

88. He and his future wife dated until their marriage in March 2006, and Mr. Moffett bought a house out of his own money in which both he and his alien wife lived.

89. In May 2007, Mr. Moffett's wife called the police, falsely accused him of assault, had him arrested, and with the aid of the courts forced him out of the house he paid for. The arrest, no conviction, has had a negative effect on his occupation causing financial loss.

90. Mr. Moffett spent three days in jail during which time his alien wife looted his bank account.

91. Mr. Moffett's wife falsely accused him of abuse and obtained a one-year order of protection on May 30, 2007.

92. Mr. Moffett's wife offered to modify the order of protection to allow him to return to his house if he wrote USCIS a letter stating he was abusive to her. He refused.

93. A feminist advocacy and legal aide group called "Civil Society Helps" assisted the alien wife in alleging abuse in order to expedite her immigration application under the VAWA process.

94. Mr. Moffett divorced his wife in April 2008 and child support was awarded to the wife for care of the their son.

95. On information and belief, Mr. Moffett alleges that his ex-wife is currently pursuing permanent residency through the VAWA process.

<u>Bruce Cardozo</u>

96. Bruce Cardozo co-named plaintiff or co-class representative, individually and on behalf of all the others similarly situated, both past, present and future, challenges the constitutionality of the statutes and regulations listed in bold in this complaint and the application of those statutes and regulations to the members of the plaintiff class.

97. The claims of Mr. Cardozo arise out of the same unconstitutional procedures and course of conduct by the defendants and are based on the same legal theories as for the entire class.

98. Mr. Cardozo lives in California and first met his future alien wife on a trip to the Ukraine in 1999.

99. In 2001, his wife came to America on a fiancée visa sponsored by another man.

100.    There was no marriage to that man, so she left the U.S. for Mexico and then walked across the border back into the U.S.

101.    Living in Orange County, California, she contact Mr. Cardozo and the two began dating.

102.    The two married in July 2001.

103.    Financial problems caused Mr. Cardozo's wife to periodically erupt in angry.  Mr. Cardozo finally notified her that he was thinking of a divorce.  She promptly struck him twice.

104.    Mr. Cardozo called the police, and they arrested him based on a false allegation of assault by his alien wife.  The charges were later dropped as fraudulent.

105.    The alien wife received a temporary order of protection by falsely alleging that Mr. Cardozo beat her on a monthly basis.

106.    Mr. Cardozo filed for divorce.

107.    The alien wife received a permanent order of protection based on fraudulent evidence that lasted until the divorce proceedings ended four years later.

108.    Corporations check whether applicants have restraining orders filed against them, and if so, usually deny the applicant a job, which is what happened to Mr. Cardozo.  He was unable to change jobs for four years because of the restraining order granted his alien wife.

109.    Mr. Cardozo's alien wife also falsely accused him twice of violating the protection order, but the city prosecutor determined the accusations were bogus.

110.    The alien wife subsequently used VAWA to acquire permanent residency.

111.    Mr. Cardozo's cost in legal fees alone is over $40,000.

David Brannon

112.    David Brannon co-named plaintiff or co-class representative, individually and on behalf of all the others similarly situated, both past, present and future, challenges the constitutionality of the statutes and regulations listed in bold in this complaint and the application of those statutes and regulations to the members of the plaintiff class.

113.    The claims of Mr. Brannon arise out of the same unconstitutional procedures and course of conduct by the defendants and are based on the same legal theories as for the entire class.

114.    Mr. Brannon lives in Walkersville, Maryland, and first started communicating by email with his future alien wife in January 2005.

115.    Mr. Brannon traveled to Rostov-on-Don in May 2005 to meet her in person and to Moscow in September 2005 also to be with her.

116.    Mr. Brannon sponsored her for a fiancée visa, and she arrived in the U.S. in November 2005.

117.    The two married, and in August 2006 his alien wife received a temporary green card.

118.    From January to March 2007, the two saw a marriage counselor to work through some of the problems they were having—none of which were abusive.

119.    The marriage wasn't working and Mr. Brannon offered his alien wife a divorce.

120.    The next day, April 19, 2007, he was served with an order of protection in which his alien wife falsely accused him of mental and physical abuse and threatening to kill her. He was ordered out of the house that he had bought with his own money prior to dating his alien wife. He was homeless for nine days at a cost of $500.

121.    The temporary order was dismissed for lack of evidence.

122.    Mr. Brannon's alien wife currently receives free legal counsel from a female advocacy group.

123.    Divorce proceedings are pending.

124.    The financial costs to Mr. Brannon are currently at $22,000 and increasing.

125.    On information and belief, Mr. Brannon alleges his alien wife has or will shortly pursue permanent residency through he VAWA process.

## V.  USCIS Vermont Service Center is biased against U.S. citizen husbands.

126.    The Vermont Service Center for the USCIS has a small corps of officers that makes the Service's decisions in the first step to permanent residency: the VAWA self-petitions, which means these officers decide whether a citizen husband committed "battery," "extreme cruelty," or an "overall pattern of violence" against his alien wife.

127.    The VAWA Unit for the Vermont Service Center has been unduly influenced by a special interest group biased against men and made up of a coalition of feminist organizations often

funded by taxpayer dollars under VAWA or granted tax exemption by the Internal Revenue Service.

128.    On information and belief, some of the feminist organizations exerting undue influence on the VAWA Unit are A.I.S.T.A., Immigrant Legal Resource Center, Catholic Legal Immigration Network, National Immigration Project of the National Lawyers Guild, and the National Network on Behalf of Battered Immigrant Women.

129.    Through administrative advocacy, training of VAWA officers, and provision of informational materials by private feminist organizations, feminist influence has reached such an extent that the VAWA Unit now operates as a virtual extension of the feminist special interest group by making decisions that largely further the group's anti-male agenda.

130.    As Gail Pendleton of the National Immigration Project for the National Lawyers Guild says "The Vermont VAWA supervisors are extremely sympathetic to those applying [predominantly alien wives] … [and] are adept at teaching adjudicators the errors of their ways, and appreciate hearing about problems occurring in the field."  The VAWA supervisors also "communicate regularly with VAWA [feminist] advocates" and an immigration lawyer is "more likely to prevail swiftly with the VAWA supervisors at [the Vermont Service Center]…."  Applications for Immigration Status under the Violence Against Women Act, by Gail Pendleton and Ann Block, pp. 14, 16 (2001).

131.    Ms. Pendleton also counsels immigration lawyers to contact the National Immigration Project "to discuss your legal arguments and a strategy for convincing Vermont you are right," id., and to contact the National Immigration Project if lawyers for alien wives are experiencing any "problems" with a local district office, id. at 17.

132.    The National Immigration Project also provides legal advice to immigration lawyers for alien wives in the form of sample briefs and motions and is working to make certain "problem" USCIS districts more amendable to ruling in favor of alien wives by expeditiously finding U.S. husbands guilty of "battery" and "extreme cruelty."  See Id. at 16.

133.    Ms. Pendleton counsels that "practice pointers gleaned from working closely with both [USCIS] and numerous [feminist] advocates for battered immigrant [women] are essential sources of information on how to win VAWA cases."  Id. at 27.

134.    For example, the National Immigration Project advises immigration lawyers to move to suppress any information provided by an alien wife's U.S. husband.  Id. at 16.

135.    Ms. Pendleton also asserts about the EOIR that it is more "VAWA friendly" after receiving special training.  Id. at 21.

136.    The officials of the VAWA Unit at the Vermont Service Center have virtually unfettered authority to determine the type and importance of information submitted for making decisions.

137.    On information and belief, officials of the VAWA Unit exercise their authority so as to further the feminist agenda of deterring American men from marrying foreign females by finding citizen husbands guilty of "battery," "extreme cruelty," or "overall pattern of violence" on the mere say-so of their alien wives.

.

138.    The officials of the VAWA Unit also have the discretion to waive crimes of moral turpitude, prostitution, procuring, and commercial vice committed by an allegedly abused alien wife, 8 U.S.C. § 1182(h)(1)(C); and to waive fraud and material misrepresentations made by the alien wife to gain entry into America, 8 U.S.C. § 1182(i).

139.    On information and belief, the VAWA Unit officials exercise this authority to give preferential treatment to alien wives and rubber stamp allegations of abuse against class members.

### VI.  VAWA, IIRIRA and INA provisions that infringe members' Constitutional rights.

Secrecy

140.    Federal laws **8 U.S.C. § 1367(a)(2) & (c)** prohibit any employee of the Department of Justice, Department of Homeland Security, and Department of State from disclosing any information concerning proceedings involving a VAWA self-petitioning alien wife.

141.    The provisions are intended to conceal proceedings from the husband merely because he has been accused of "battery," "extreme cruelty," or "overall pattern of violence."  Secrecy is maintained with respect to other individuals unless they fall within certain exceptions, such as the alien wife, various feminist advocacy groups that provide benefits, and law enforcement.  A Government violator may face disciplinary action and a fine up to $5,000.

*Procedural Due Process*

142.    The statutory secrecy maintained by the defendants over the VAWA process deny class members of procedural due process to refute accusations of "battery," "extreme cruelty," or "overall pattern of violence," and deny class members of at least having a chance to prevent administrative decisions that find them guilty of "battery," "extreme cruelty," or "overall pattern of violence."

143.    The defendants' secrecy infringes class members' First Amendment rights to speak by denying them any opportunity to be heard on their own behalf in order to counter accusations and prevent findings of "battery," "extreme cruelty," or "overall pattern of violence."

144.    Statutory secrecy results in the defendants preventing speech of class members before it occurs.

145.    The statutory secrecy enforced by the defendants infringes the class members' First Amendment rights of access to deportation proceedings by making it impossible for them to

determine if, when or where any proceedings would be held in which they are accused of and adjudged responsible for "battery," "extreme cruelty," or "overall pattern of violence."

146.    The statutory secrecy used by the defendants abridges class members' rights to freedom of choice in marital decisions by presenting them with a Faustian choice of acceding to the criminal demands of an alien wife to sponsor her for permanent residency or a Star Chamber proceeding by which the defendants find a class member guilty of "battery," "extreme cruelty," or "overall pattern of violence."

147.    The behind closed-doors proceedings permit the defendants to invade the privacy interests of class members in matters such as marriage, procreation, contraception, family relationships, and child rearing without providing class members the means for preventing any unfair or arbitrary invasion of their privacy.

148.    Secret proceedings allow alien wives, their lawyers and private feminist advocacy organizations to lie with impunity because there are no procedures by which class members can counter such falsehoods about their private lives, reputations, honor and integrity.

149.    The secrecy provisions prevent class members from protecting their privacy, personal reputations, honor and integrity because they cannot determine whether something injurious to them is actually taking place, what personal matters are being revealed, what findings and decisions are being made, what someone is saying about them, or who's saying it.

150.    The medieval Inquisition at least allowed the accused to appear before his judges, although probably on the rack.  But with the VAWA secrecy statutes, a U.S. husband never knows he's being judged or for what.  The defendants skip the rack and go right to finding him guilty.

151.    Federal laws **8 U.S.C. § 1367(b)(2)(4) & (5)** allow information concerning "battery," "extreme cruelty," or "overall pattern of violence" to be disclosed to alien wives; law enforcement officials; and private feminist organizations and Federal, State, and local public agencies that provide benefits to alien wives if in the opinion of those organizations class members abused their alien wives, 8 U.S.C. § 1641(c)(1).

152.    Citizen husbands cannot prevent any privacy information or false statements about them from being disclosed to the above persons or prevent them from in turn making the information public.

153.    Any information concerning "battery," "extreme cruelty," or overall pattern of violence" that is available to these persons includes the findings of fact and decisions by the defendants as well as information submitted by the alien wives, their immigration attorneys, and feminist counselors.

154.    In the event that an alien wife or private feminist organization makes available to others information implicating a class member's privacy interests, reputation, honor or integrity, the class member will most likely have no cause of action to redress the harm done.

155.    Defamation does not lie for false statements in official proceedings of an administrative agency, false light fails unless the information is used for commercial purposes, and *prima facie* tort requires a primary purpose.

156.    An action for invasion of privacy may exist depending on the state in which the class member lives.

157.    The secret VAWA process also unfairly and arbitrarily denies class members the right to institute administrative or judicial procedures, such as under the Privacy Act, 5 U.S.C. 552a, to correct inaccurate government records because VAWA prevents access to the records by class members.

*Equal Protection – national origin*

158.    On their face, the statutory provisions for secret proceedings do not apply to alien spouses but only apply to U.S. citizen spouses which is a violation of the equal protection rights under the Fifth Amendment accorded U.S. citizens.

159.    The secrecy proceedings of the defendants invidiously discriminate against class members' national origin—America, because the secrecy of the proceedings applies only to U.S. citizens, but not to their alien wives who are of any nationality other than American.

*Equal Protection – sex*

160.    The secrecy proceedings were intended and are overwhelmingly used by alien wives against citizen husbands thanks, in part, to federal funding of feminist advocacy groups; therefore, the statutes as applied and in effect invidiously discriminate on the basis of sex against U.S. husbands.

161.    The secrecy proceedings of the defendants violate class members' equal protection rights because secrecy applies to them due to their sex; whereas, were they American females, the entire VAWA process would most likely not be used against them because federally funded feminist groups almost exclusively provide assistance to only alien wives; and if VAWA were evoked against an American wife, it would likely fail because of the favoritism given females by the VAWA Unit at the USCIS Vermont Center.

Turning a blind eye

162.    Federal law **8 U.S.C. § 1367(a)(1)(A)** prohibits any employee of the Department of Justice, Department of Homeland Security, and Department of State from making an adverse determination of inadmissibility or deportability of a VAWA self-petitioning alien wife based solely on evidence provided by the U.S. citizen husband.

163.    Evidence provided by a U.S. citizen husband cannot be used against an alien wife unless the defendants acquire independent corroboration from a third party unrelated to the husband. <u>Virtue Memorandum INS</u>, 74 Interpreter Releases 795 (1997).

*Procedural Due Process*

164.    The defendants violate class members' procedural due process rights by failing to take into account any evidence class members might provide that call into question the credibility of alien wives on whom the agencies rely for finding class members responsible for "battery," "extreme cruelty," or "overall pattern of violence."

165.    The defendants infringe class members' freedom of speech by disregarding any statements by them that counter statements by an alien wife about a class members' alleged abuse.

166.    The statutory requirement of ignoring any evidence submitted by class members adverse to alien wives abridges class members' right to freedom of choice in marital decisions because it leaves them with only two options:  (1) accede to the criminal demands of an alien wife and sponsor her for permanent residency or (2) have any evidence as to a class member's innocence of "battery," "extreme cruelty," or "overall pattern of violence" discarded no matter how relevant, trustworthy, and credible.

167.    Any evidence a class member might provide to protect his privacy, reputation, honor or integrity will be ignored if it refutes information submitted by the alien wife no matter how relevant, trustworthy, or credible the class member's evidence may be.

168.    The statute requiring the discarding of a class member's evidence encourages and causes alien wives to manufacture a public record trail that they will use in subsequent VAWA proceedings because the defendants will not consider any contrary evidence from class members.

*Equal Protection – national origin*

169.    Section **8 U.S.C. § 1367(a)(1)** on its face violates equal protection as incorporated into the Fifth Amendment by giving an alien's word credibility while discounting the believability of a U.S. citizen's statement.  The unconstitutional classification is one of national origin:  alien v. American.

170.    The defendants violate class members' equal protection rights by believing statements and evidence provided by their alien wives while ignoring any statements or evidence from class members because of their national origin—America.

*Equal Protection - sex*

171.    The discounting of evidence supplied by a U.S. citizen was intended and overwhelmingly occurs in cases involving alien wives; therefore, the statute as applied and in effect invidiously discriminates on the basis of sex against U.S. husbands.

172.    Under the statute's evidentiary standard, the alien wife need only accuse her husband of "battery," "extreme cruelty," or "overall pattern of violence" and magically she doesn't have to disprove any evidence the husband might submit to protect his privacy interests, reputation, honor or integrity because his evidence is ignored unless the defendants decide to make the effort to find independent corroboration from a third party unconnected with the husband.

173.    By contrast, the defendants will accept as primary proof of an alien wife's good moral character her own affidavit drafted by her immigration lawyer.  8 C.F.R. 204.2(c)(2)(v). There are no safeguards to assure a foreigner doesn't lie in order to win the valuable prizes of permanent U.S. residency and citizenship.

174.    The defendants will also accept an alien wife's affidavit as primary proof without any corroborating evidence that a marriage was terminated as a result of the husband's "battery," "extreme cruelty," or "overall pattern of violence" as required by 8 U.S.C. § 1154(a)(1)(A)(iii)(II)(aa)(CC)(ccc) or that any absences from the country resulted from "battery," "extreme cruelty" or "overall pattern of violence" as required by 8 U.S.C. 1229b(b)(2)(B).

175.    In determining whether an alien wife entered into marriage in good faith as required by 8 U.S.C. § 1154(a)(1)(A)(iii)(II)(aa), the defendants require a preponderance of the evidence, but since the only evidence the defendants typically consider comes from the alien wife, any statement she makes or information she provides will amount to a preponderance of the evidence regardless of its truth or falsity.

176.    The defendants violate class members' equal protection rights by believing statements and evidence provided by alien wives while ignoring any statements or evidence from class members because they are men.

<u>Relying on untrustworthy evidence</u>

177.    Federal laws **8 U.S.C. § 1154(a)(1)(J), 8 C.F.R. § 204.2(c)(1)(iv),** and **61 Fed. Reg. 13,066,** allow the USCIS in granting self-petitions by alien wives to rely on irrelevant, untrustworthy, unauthenticated, multiple hearsay, uncontested, and character trait evidence and to give primary weight to the alien wife's affidavit without any corroborating facts.

178.    Under the statute, the defendants reserve the power to arbitrarily decide the truth regardless of the relevance, competence, or credibility of the information provided by the allegedly abused alien wife.  8 C.F.R. 204.2(c)(2).

*Procedural Due Process*

179.    The defendants in secret administrative proceedings violate class members' procedural due process rights under the Fifth Amendment by deciding they are responsible for "battery," "extreme cruelty," or an "overall pattern of violence" based on incompetent evidence, such as:

    a.    temporary orders of protection issued in *ex parte* proceedings,

    b.    uninvestigated and unproven police complaints filed by an alien wife,

    c.    affidavits by alien wives that class members have no opportunity to refute,

    d.    cover letters and unauthenticated documents submitted by an alien wife's lawyer who is often paid for by the Federal Government, and

    e.    affidavits and statements from other individuals, including private feminist providers of benefits to allegedly abused wives, that are based on hearsay, unauthenticated documents, and character trait evidence.

180.    Private feminist organizations exploit the lack of procedural due process controls on information harmful to the U.S. husband by suggesting to alien wives that they use certain excuses acceptable to the defendants for not pursuing a temporary order of protection to final judgment, regardless of whether the excuse applies to her.

181.    The defendants violate class members' procedural due process rights by accepting without corroboration one or all of the following excuses for an alien wife's failure to obtain a final order of protection against a class member:

    a.    the class member threatened her if she pursued a final order,

    b.    the alien wife didn't understand the law as explained to her in English, or

    c.    the class member promised to change.

182.    Private feminist organizations also exploit the lack of procedural due process controls on information against the U.S. husband by giving the alien wife acceptable excuses, regardless of the truth, for her marriage being of a short duration, such as blaming its brevity on the U.S. husband's "battery," "extreme cruelty," or "overall pattern of violence."

183.    The defendants violate class members' procedural due process rights by accepting without corroboration an alien wife's assertions that her marriage to a class member was short because of his "battery," "extreme cruelty," or "overall pattern of violence."

184.    The defendants infringe class members' freedom of speech, limit their freedom of choice in marital affairs, encourage and cause the invasion of privacy interests, encourage and cause injury to reputation, honor or integrity by wrongly attributing to alien wives the saintly virtue of truth telling.

*Equal Protection – national origin and sex*

185.    The defendants' primary reliance on evidence submitted by alien wives violates the equal protection of their U.S. husbands by invidiously discriminating against U.S. citizens based on their national origin—America.

186.    The defendants' reliance on evidence submitted by alien spouses was intended by the statute and overwhelmingly occurs in cases involving alien wives; therefore, the statute as applied and in effect invidiously discriminates on the basis of sex against U.S. husbands.

187.    The defendants violate class members' equal protection rights on two fronts:  they find class members guilty of "battery," "extreme cruelty," or "overall pattern of violence" based on information the defendants deem relevant, competent, and credible because (1) it is submitted by an alien and because (2) the alien is female.

The standards for "battery," "extreme cruelty," and "overall pattern of violence" are void for vagueness and overbreath.

188.    "Self-petitioning" under **8 U.S.C. § 1154(a)(1)(A)(iii)(I)(bb) & (II)(aa)(CC)(ccc)**, cancellation of removal under **8 U.S.C. § 1229b(b)(2)(A)(i) & (C)**, waiver of inadmissibility under **8 U.S.C. § 1182(h)(1)(C) & (i)**, waiver of deportation under **8 U.S.C. § 1227(a)(1)(H)(ii)**, non-disclosure of information under **8 U.S.C. § 1367(a)(2)**, prohibition on evidence from U.S. citizens under **8 U.S.C. § 1367(a)(1)(a)**, and definitions under **8 U.S.C. § 1641(c)(1)(A)**, **8 C.F.R. § 204.2(c)(1)(vi)** and **61 Fed. Reg. 13,061, 13,065-066** all require that the U.S. citizen husband engage in "battering" or "extreme cruelty" or an "overall pattern of violence."

189.    None of the statutes, nor the Code of Federal Regulations, nor the Federal Registry explicitly define the phrase "was battered by or was the subject of extreme cruelty" or provide guidelines for determining what constitutes such actions outside of a few "egregious examples" and a warning that officials will know them when they see them, which allows the defendants and their underlings to determine "battery" and "extreme cruelty" on the basis of their personal preferences.

190.    Under the regulations, "was battered by or was the subject of extreme cruelty" includes, but is not limited to, acts of "violence" or threatened acts of "violence" that result in physical or mental injury.  Psychological "abuse" is considered "violence" as are "[o]ther abusive actions … that may not initially appear violent but are a part of an overall pattern of violence." **8 C.F.R. 204.2(c)(1)(vi)**.

191.    In VAWA proceedings, the term "violence" has no dictionary meaning but is a grab bag of any activity or speech with the only requirement that the defendants or their underlings say it is violence.

192.    The Federal Register even admits the overbroad reach of the "flexible" concepts of "battery," "extreme cruelty" and "overall pattern of violence" by stating, "[i]t is not possible to cite all perpetrations that could be acts of violence under certain circumstances… [so] the rule does not itemize abusive acts other than those few particularly egregious examples." **61 Fed. Reg. 13,061, 13,066 (1996)**.

193.    The defendants will even use non-battery and non-cruelty acts and speech—also undefined—to "establish a pattern of abuse and violence and to bolster claims" that "battery" or "extreme cruelty" occurred.  **61 Fed. Reg. 13,061, 13,066**.

194.    Under these indefinite and virtually boundless terms as used by the defendants, a citizen husband will be found to have "battered" or subjected to "extreme cruelty" or an "overall pattern of violence" his alien wife without any distinction among criminal wrongs or civil wrongs or conduct or speech that is not a wrong but is considered "offensive" based on the subjective sensitivities of members of the powerful special interest group that put those nebulous terms into the law in the first place—the feminists.

195.    The defendants, on information and belief, even include in "battered by or was the subject of extreme cruelty" a husband insulting his alien wife at home or in public, arguing loudly with her, or engaging in some other undefined "inappropriate"[4] verbal communication.

196.    The terms "battery," and "extreme cruelty" were intentionally left imprecise and over inclusive for their *in terrorem* effect on class members.  The purpose and impact is to domineer over virtually every aspect of a class members' marital relationship with his alien wife by punishing him for acts that include Constitutionally protected speech he may use in times of quarrels and in times of making-up.  It's an example of using political power to control the purely personal when no criminal or civil wrongs have occurred but only a failure to sacrifice liberty by not conforming to the self-righteous dictates of the feminist establishment.

197.    Such standards effectively deter or chill a class members' freedom of speech by creating the threat that he may fall prey to bureaucrats steeped in feminist dogma to remake man in the image they desire but not Mother Nature.

198.    Because the terms "battery" and "extreme cruelty" as used in VAWA proceedings are so nebulous and expansive, they provide no clear guidance as to the nature of speech or conduct that may subject a class member to a Star Chamber proceeding that violates his procedural due process and equal protection rights in finding him responsible for "battery" or "extreme cruelty."

199.    Even the common law definition of battery as offensive touching does not sufficiently narrow that term as used by the defendants because it could include anything from a class

---

[4] By using "inappropriate", a very subjective term, VAWA apparently is meant to appropriate the freedom of speech of anyone who disagrees with the feminist lobby.

member kissing his alien wife when she doesn't want to be kissed to felony assault.  *See* **61 Fed. Reg. 13,061**, **13,066**.

200.   The regulation **8 C.F.R. § 204.2(c)(1)(vi)** and the Federal Register's **61 Fed. Reg. 13,061, 13,065-066** fail to define or give guidelines for determining an "overall pattern of violence," whether physical or mental.

201.   The nebulous and expansive statutory and regulatory standards for determining "battery," "extreme cruelty," or "overall pattern of violence" violate the First Amendment's free speech clause and the due process clause of the Fifth Amendment by being vague and overbroad and violate the Equal Protection part of Due Process by (1) burdening the freedom of speech of U.S. Citizens with alien spouses, but not U.S. Citizens with non-alien spouses and (2) burdening as intended and as applied the freedom of speech of U.S. husbands with alien wives but not U.S. wives with alien husbands.

202.   The defendants harm class members by using the vague and overbroad standards of "battery," "extreme cruelty," and "overall pattern of violence" to find class members responsible for such, which violates their rights to free speech, procedural due process and equal protection.

203.   The defendants harm class members because the nebulous standards encourage and cause alien wives to manufacture a public trail of records prior to evoking VAWA that invade class members' privacy interests and injure a member's reputation, honor and integrity.

204.   The defendants' failure to specifically define the conduct prohibited creates an unreasonable risk that deters American men from exercising their rights to marry foreign females.

Bills of attainder in violation Article  1, § 9, cl. 3 of the U.S. Constitution

205.   Congress passed the above challenged statutes knowing that they would overwhelmingly punish an unpopular group—American men who look overseas for wives.  Only rarely do American females go abroad for husbands.

206.   The statutes, however, also punish all American men by effectively limiting their freedom of choice to wives in America because marriage to and divorce from an alien wife makes any citizen man vulnerable to false allegations of "battery," "extreme cruelty," and "overall pattern of violence" without any legal recourse to disprove those allegations.

207.   When Congress passed the challenged statutes, the wording and legislative history shows an intent to apply the statutes against U.S. citizen husbands by repeatedly claiming Congress's purpose was to allow allegedly abused alien "women" a fast-track to permanent residency and ultimately to citizenship.

208.   Congress's purpose in passing the challenged statutes was not to prevent citizen husbands of alien wives from using the Immigration and Nationality Act ("INA") to maintain power

and control over their alien wives because those husbands, unless employees of the USCIS or EOIR or "with hands across the White House," do not pull the levers of executive power.

209.    The INA is administered by the Executive Branch of the Federal Government not by individual citizens married to or divorced from alien wives.

210.    The objective of the challenged statutes is <u>not</u> to keep American men who are married to alien wives from subverting the administration of the INA, but to punish those men by violating their constitutional rights to freedom of speech, right to privacy, freedom of choice in marital relationships, right of access to deportation proceedings, procedural due process, and equal protection under the law in violation of the First and Fifth Amendments to the United States Constitution.

211.    Congress passed the statutes in order to placate the feminist lobby.

212.    The entire process of obtaining VAWA permanent residency as created by the feminist lobby is geared toward punishing the American man by violating his rights, invading his privacy, and creating an unacceptable risk for destroying his reputation, honor and integrity without the safeguards of constitutional procedures and merely on the say-so of an alien wife and the feminist organizations that counsel her to allege "battery," "extreme cruelty," and an "overall pattern of violence."

213.    The amorphous nature of the terminology "battery," "extreme cruelty," and "overall pattern of violence" fail to provide a reasonable criteria by which any American man could conform his conduct in order to escape the application of the statutes to him if he chose to exercise his right to bring a foreign wife home.

214.    The statutes' ever-present threat of unconstitutional punishment acts as a deterrent to any American man marrying a foreign female, which has the effect of confining him to the pool of feminists and female allies of the feminists in America—an infringement of his freedom of choice in marital affairs.

215.    There are no other grounds for explaining the challenged statutes because an abused alien wife in America has recourse to the police, courts, and numerous legal aid groups to prevent abuse and avoid deportation without the need for a rubber stamp process to permanent residency that violates the constitutional rights of her citizen husband.

216.    The defendants collaborate with private feminist groups providing benefits to allegedly abused alien wives and the immigration lawyers representing those wives to execute these bills of attainder against U.S. citizen husbands.

217.    The challenged statutes level a permanent proscription against any opportunity for an American husband to defend his innocence and to prevent the most powerful nation in the history of the world from adjudging him guilty of "battery," "extreme cruelty," or an "overall pattern of violence."

218.  "Those who wrote the Constitution well knew the danger inherent in special legislative acts which take away the life, liberty, or property of particular … persons, because the legislature thinks them guilty of conduct which deserves punishment." <u>United States v. Lovett</u>, 328 U.S. 303, 317, 66 S. Ct. 1073, 90 L. Ed. 1252 (1946)(Mr. Justice Black who delivered the opinion of the Court).

## VII.  Relief Sought

219.  The plaintiff class requests:

    a.  this Court declare the above statutes and regulations highlighted in bold unconstitutional;

    b.  injunctive relief to put a halt to the application of these statutes and regulations in VAWA proceedings that are currently under way but of which the plaintiff class is prohibited from finding out about;

    c.  injunctive relief to prevent the future application of these statutes and regulations to future and current class members—there exists a real likelihood that current members will once again marry a foreign female and find themselves in a similar position;

    d.  nominal damages as vindication for the violation of the class members' rights by the past application of these statutes and regulations;

    e.  each relevant member be granted access to defendants' records equivalent to the access currently allowed to that member's alien wife, her attorney, and any private feminist organizations or Federal, State, and local public agencies that provide benefits to alien wives;

    f.  each relevant member be allowed to contest the findings and decisions that hold him responsible for "battery," "extreme cruelty" or an "overall pattern of violence" against his alien wife, that in contesting those findings the procedures and evidentiary requirements will be the same as those that applied to the alien wife, that the member will be guaranteed a neutral decision maker at the appropriate district office of the USCIS or EOIR, which will not be a decision maker from the VAWA Unit at the Vermont Service Center, and that the member will have a right to appeal in the same fashion similar to that of his alien wife;

    g.  the institution of procedures that allow a class member to prevent the disclosure of information relating to him on grounds the information is false or invades his privacy interests;

    h.  injunctive relief to prevent the execution of affidavits of support against class members pending the contesting of the findings against them of "battery," "extreme cruelty" or an "overall pattern of violence."

i.   this Court instruct the defendants to specifically define the conduct that they label "battery," "extreme cruelty" or an "overall pattern of violence" so that the defendants will no longer be permitted to arbitrarily apply those terms to class members.

j.   this Court require that the VAWA self-petitioning procedure be removed from the Vermont USCIS Service Center and de-centralized into the USCIS district offices were such decision making previously resided;

k.   this Court require that feminist advocacy and any other advocacy groups that participate in the VAWA process take affirmative action to expand their client base to include a nearly equal number of foreign men married to U.S. citizen females or have their federal funding stopped.

## VIII.  Defendants

220.    This action is against Secretary Michael Chertoff, U.S. Department of Homeland Security, Director Emilio Gonzales, U.S. Citizenship and Immigration Services (formerly Immigration and Naturalization Service), U.S. Attorney General Michael B. Mukasey, Director Kevin Ohlson, Executive Office for Immigration Review U.S. Department of Justice.

## IX.  Sovereign Immunity

221.    This action falls within an exception to sovereign immunity because it alleges as unconstitutional various statutory powers exercised by the defendants against class members; further, 5 U.S.C. § 702 provides exceptions to sovereign immunity for declaratory and injunctive relief.

## X.  Subject Matter Jurisdiction

222.    This Court has subject matter jurisdiction over this action under 28 U.S.C. 1331 because this action raises federal questions in challenging a number of federal statutes and regulations as violating the U.S. Constitution.

## XI.  Personal Jurisdiction

223.    This Court has personal jurisdiction over the defendants in accordance with Fed. R. Civ. P. 4(i)(2).

## XII.  Venue

224.    This Court has venue under 28 U.S.C. 1391(e)(3) because Mr. Den Hollander is a resident of New York, New York and no real property is involved.

27

## XIII.  Conclusion

225.     As the law created by feminist lobbying now stands, alien females prone to criminal pursuits can become permanent residents and eventually U.S. citizens by simply saying their American husbands abused them, and it will not matter that these females are lying, committed crimes of moral turpitude, violated drug laws, worked as prostitutes and procurers, or used fraud and perjury to gain entry into the U.S. and to stay here.

226.     In practice and intent, the Violence Against Women Act and certain sections of the Illegal Immigration Reform and Immigrant Responsibility Act and Immigration and Nationality Act create a process by which the constitutional rights of American men who take foreign wives are violated in order to rectify the feminists' inability to make American men love them.


Dated:  May 2, 2008
        New York, N.Y.

                                            /S/
                              _____
                              Roy Den Hollander, Esq. (1957)
                              Attorney and plaintiff
                              545 East 14 Street, 10D
                              New York, N.Y. 10009
                              (917) 687-0652