UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
Roy Den Hollander, Sean Moffett, Bruce Cardozo, and
David Brannon,

                    Plaintiffs on behalf of themselves
                    and all others similarly situated,

                    -against-

Secretary Michael Chertoff U.S. Dept. Homeland Security,
Director Emilio Gonzales U.S. Citizenship and Immigration Services
            (formerly Immigration and Naturalization Service),
U.S. Attorney General Michael B. Mukasey,
Director Kevin Ohlson Executive Office for Immigration Review
          U.S. Department of Justice,

                    Defendants.
--------------------------------------------------------------------x

Docket No.
08 CV 01521(WHP)(ECF)


**MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION TO
DISMISS THE AMENDED COMPLAINT**

Roy Den Hollander
Attorney and co-plaintiff
545 East 14 Street, 10D
New York, N.Y. 10009
Tel.: (917) 687-0652
Email: rdhhh@yahoo.com

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ……………………………………………….……………… 1

DIVORCE VAWA STYLE …………………………………………………………………… 5

CLASS MEMBERS or GROUP A …………………………………………………………… 6

STANDING …………………………………………………………………………………… 7

       Procedural due process violations ..…………………………………………………… 8

       Procedural due process injuries …………………………………………….…… 11

       Equal protection violations ……………………………………………………… 16

       Equal protection injury ………………………………………………………….. 19

       Overbroad and Vague and Injury ……………………………………………... 20

       Bill of Attainder and Injury …………………………………………………… 21

       Causation and Remedies of Injuries ………………………………………….... 22

RULE 12(b)(6) ……………………………………………………………………………... 23

CONCLUSION ……………………………………………………………………………... 25

# TABLE OF AUTHORITIES

**Page**

**Constitution**

U.S. Const. I. § 9 cl. 3 ……………………………………………………………… 21

**Cases**

Andrews v. Gardiner, 224 N.Y. 440, 121 N.E. 341 (1918) ………………………………... 10

Armstrong v. Manzo, 380 U.S. 545 (1965) ……………………………………………… 8

ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) …………………… 23

Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955 (2007 …………………………..……… 23, 24

Bell v. Hood, 327 U.S. 678 (1946) …………………………………………………… 7

Bennett v. Spear, 520 U.S. 154 (1997) ………………………………………………... 22

Bernal v. Fainter, 467 U.S. 216 (1984) …………………………………...………… 17

Broadrick v. Okla., 413 U.S. 601 (1973) ……………………………………………… 20

Bryant v. Yellen, 447 U.S. 352 (1980) ………………………………………………... 14

Carey v. Piphus, 435 U.S. 247 (1978) ………………………………………………… 12

Connolly v. General Constr. Co., 269 U.S. 385 (1926) ………………………………… 20

Cronin v, FAA, 73 F.3d 1126 (D.C.Cir. 1996) ……………………………………….. 13

Cummings v. Missouri, 4 Wall. 277 (1867) …………………………………...……… 21

Duke Power Co, v. Carolina Envtl. Study Group, Inc., 438 U.S. 59 (1978) ……...… 14, 22, 23

Evers v. Dwyer, 358 U.S. 202 (1958) …………………………………..…………….. 12

F.E.C. v. Akins, 524 U.S. 11, 25 (1998) ……………………………………………… 22

Foretich v. United States, 351 F.3d 1198, 1213 (2003) ………………………………… 13

Frontiero v. Richardson, 411 U.S. 677 (1973) ………………………………………… 16

Goldfine v. Sichenzia, 118 F.Supp. 2d 392 (S.D.N.Y. 2000) ……………………………….. 24

Grayned v. City of Rockford, 408 U.S. 104 (1972) ………………………...………. 20, 21

Greene v. McElroy, 360 U.S. 474 (1959) …………………………………………………… 9

Gregory v. Daly, 243 F.3d 687 (2d Cir. 2001) ……………………………………………… 24

Harper v. Virginia State Bd. of Elections, 383 U.S. 663 (1966) …………………………. 16

Heckler v. Mathews, 465 U.S. 728 (1984) ………………………………………………... 19

Hernandez v. Ashcroft, 345 F.3d 824 (9th Cir. 2003) ……………………………………... 18

Hunter v. Underwood, 471 U.S. 222 (1985) ………………………………………………  18

Iqbal v. Hasty, 490 F.3d 143 (2d Cir. 2007) ……………………………………………… 25

Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123 (1951) ………..…… 8, 11

L'Europeene de Banque v. La Republica de Venezuela,
700 F. Supp. 114 (S.D.N.Y. 1988) ……………………………………………………….. 24

Loving v. Virginia, 388 U.S. 1 (1967) …………………………………………………... 1

Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986) …………………………………………….. 5

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ……………………………………… 11

Massachusetts v. EPA, 127 S. Ct. 1438 (2007) …………………………………………… 23

Mathews v. Eldridge, 424 U.S. 319 (1976) ………………………………………………… 8

M.L.B. v. S.L.J., 519 U.S. 102 (1996) …………………………………………………… 9

Neu v. Corcoran, 869 F.2d 662 (2d Cir. 1989) …………………………………………… 10

Northeastern Fla. Assoc. Gen. Contractors Am. v. Jacksonville, 508 U.S. 656 (1993) …... 19

N.Y.P.I.R.G. v.Whitman, 321 F.3d 316 (2d Cir. 2003) …………………………………… 15

O'Hair v. White, 675 F.2d 680 (5th Cir. 1982) …………………………………………….. 7

Olmstead v. United States, 277 U.S. 438 (1928)(Brandeis, J. dissenting) ………………… 10

O'Shea v. Littleton, 414 U.S. 488 (1974) ………………………………….………………… 8

Plessey v. Ferguson, 163 U.S. 537 (1896)(Harlan, J. dissenting) ............................ 17

Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117 (2d Cir. 2007) ........ 24

Robinson v. Overseas Mil. Sales Corp., 21 F.3d 502 (2d Cir. 1994) .......................... 8

Romer v. Evans, 517 U.S. 620, 623 (1996) ................................................ 17

Skinner v. Oklahoma, 316 U.S. 535 (1942) ................................................ 13

Thomas v. Collins, 323 U.S. 516 (1945)(Jackson, J. concurring) ............................ 2

Truax v. Raich, 239 U.S. 33 (1915) ...................................................... 17

U.S. V. Brown, 381 U.S. 437 (1965) ...............................................3, 21

U.S. v. Lovett, 328 U.S. 303 (1946) .............................................. 14, 21, 22

U. S. v. Morrison, 529 U.S. 598 (2000) ................................................... 4

U. S. v. SCRAP, 412 U.S. 669 (1973) .................................................... 23

Valmonte v. Bane, 18 F.3d 992 (2d Cir. 1994) ......................................... 14, 15

Yick Wo v. Hopkins, 118 U.S. 356 (1886) ............................................ 17, 18

Zablocki v. Redhail, 434 U.S. 374 (1978) ............................................ 16, 17

**Statutes**
(The ones in bold are the challenged VAWA provisions).

5 U.S.C. § 552(b)(7)(C)(F.O.I.A.) ....................................................... 14

5 U.S.C. 552a(d)(Privacy Act) .......................................................... 23

8 U.S.C. § 1154(a)(1)(A)(iii) ........................................................... 2

**8 U.S.C. § 1154(a)(1)(A)(iii)(I)(bb)** ................................................. 2

**8 U.S.C. § 1154(a)(1)(A)(iii)(II)(aa)(CC)(ccc)** ......................................... 2

**8 U.S.C. § 1154(a)(1)(J)** ..........................................................2, 9, 15

8 U.S.C. § 1182(a)(6)(C)(i) ............................................................ 5

8 U.S.C. § 1182(a)(6)(C)(iii) ……………………………………………..… 5

8 U.S.C. § 1182(h) ……………………………………………………….… 13

**8 U.S.C. § 1182(h)(1)(C)** ……………………………………………..…3, 5

**8 U.S.C. § 1182(i)** ……………………………………………………..… 3

8 U.S.C. § 1183a …………………………………………………………… 12

8 USCS § 1184(d) …………………………………………..…………………… 13

8 U.S.C. § 1186a ……………………………………………………………… 6

8 U.S.C. § 1186a(c) ……………………………………………………… 5

8 U.S.C. § 1186a(c)(4)(A) …………………………………………….….. 5

8 U.S.C. § 1186a(c)(4)(B) …………………………………………..…….….. 5

8 U.S.C. § 1227(a)(1)(H) ……………………………………………..…… 13

**8 U.S.C. § 1227(a)(1)(H)(ii)** …………………………..……………………3, 5

8 U.S.C. §1229b(b)(2) ……………………………………………………1, 13

**8 U.S.C. § 1229b(b)(2)(A)(i)** ……………………………………………….. 2

**8 U.S.C. § 1229b(b)(2)(C)** …………………………………………………. 2, 5

8 U.S.C. § 1255(a) …………………………………………………….......... 1

**8 U.S.C. § 1367(a)(1)(A)** …………………………………………………2, 3, 9, 10

**8 U.S.C. § 1367(a)(2)** …………………………………………………… 2, 3, 6, 9

**8 U.S.C. § 1367(b)(2)(4)(5) & (7)** ………………………………..………… 2, 10

**8 U.S.C. § 1367(c)** …………………………………………………..…… 2, 9

8 U.S.C. § 1641(c) …………………………………………………………… 14

**8 U.S.C. § 1641(c)(1)(A)** …………………………………………………… 3

Fed. R. Civ. P. 12(b)(1) ………………………………………..……………… 8, 12

Fed. R. Civ. P. 12(b)(6) ……………………………………………...……………………… 23

N.Y. Civil Rights Law § 74 ……………………………………………………….... 10

**Other**

**8 C.F.R. § 204.2(c)(1)(vi)** ………………………………………………………………… 3

**8 C.F.R. § 204.2(c)(2)(iv)** ……………………………………………………… 2, 9, 15

**61 Fed. Reg. 13,065** …………………………………………………………………… 3

**61 Fed. Reg. 13,066** ………………………………………………..………… 2, 3, 9, 15, 20

1999 National Victim Assistance Academy, chap. 8 ………………………………………… 21

American Journal of Public Health, May 2007, Vol. 97, No. 5, pp. 941-47 ……………… 20

Baskerville, Family Violence in America, (2006) ………………………………………… 18

Black's Law Dictionary, 8th ed. 1999 …………………………………………………….. 3

Family Violence Prevention Fund, Breaking the Silence - Training Manual (2006) …….. 21

Gordon, Immigration Law & Proc., revised ed. ………………………………….……… 5, 18

H.R. Rep. No. 103-395 …………………………………………………………………… 18

Pendleton, Immigration and Nationality Law Handbook, ed. 2001-02 …………………... 20

R.A.D.A.R.,VAWA Programs Discriminate Against Male Victims, Dec. 2007,
www.mediaradar.org ……………………………………………………………………… 19

Rotunda, Treatise on Constitutional Law, 4th ed. (2008) ……………………………… 9, 10

USCIS Memorandum, HQOPRD 70/6.2.11 ……………………………………………… 13

Virtue, INS Memorandum, 74 Interpreter Releases 795 (1997) …………………………. 2

Virtue, INS Memorandum, 76 Interpreter Releases 162 (1999) …………………………. 15

Wright, Fed. Prac. & Proc. Supp. (2008) ……………………………………………… 7, 23

## PRELIMINARY STATEMENT

"The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." <u>Loving v. Virginia</u>, 388 U.S. 1, 12 (1967)(Warren, C. J.).

This case involves two groups of adult human beings. The members of each group have, are or will marry the members of the other group. **Group A** consists of citizens of the United States, whether by birth or naturalization, who belong to the male sex and are husbands or ex-husbands of the members of Group B. **Group B** consists of foreign, or alien, females who are the wives or ex-wives of Group A members. The alien wives or ex-wives are <u>not</u> admitted to the U.S. as full permanent residents and are referred to as "non-permanent" aliens even though some are here illegally. Full permanent residency is one step away from naturalization. This case does <u>not</u> involve marriages between full permanent resident aliens and other aliens.

This putative class action is against the defendants for violating the civil rights of the plaintiff class: Group A. Members of Group B acquire full permanent residency by simply alleging the citizens they married mistreated them. The process was created primarily by the Violence Against Women Act ("VAWA") and its amendments, so it is referred to as the "VAWA process," Amended Complaint ¶¶ 32-39 and 45, and consists of (1) self-petitioning for immediate relative classification, 8 U.S.C. § 1154(a)(1)(A)(iii); (2) applying for cancellation of any pending deportation proceeding, 8 U.S.C. §1229b(b)(2); and (3) applying for adjustment of status to full permanent residency, 8 U.S.C. § 1255(a).

The issues are whether certain statutory provisions and regulations—but <u>not</u> all the provisions and regulations that create the VAWA process—are constitutional or their enforcement constitutional. The statutory provisions and regulations at issue are referred to as

1

"VAWA provisions" and are in bold throughout this Opposition to the defendants' Amended Memorandum to Dismiss, July 29, 2008, cited as "Memorandum."

Secrecy, **8 U.S.C. § 1367(a)(2) & (c)** make secret Federal proceedings that determine whether Group A members committed acts of "battery," "extreme cruelty," or "overall pattern of violence." The proceedings are kept secret from the accused, Group A, but not the accusers, Group B, or the accusers' immigration attorneys or private feminist organizations or Federal, State, and local public or private agencies that provide benefits to Group B members or law enforcement. **8 U.S.C. § 1367(b)(2)(4)(5) & (7)**. Democracies die behind close doors.

Turning a blind eye, **8 U.S.C. § 1367(a)(1)(A)** requires discarding any exculpatory evidence the accused might submit to the defendants solely because it passed through his hands. Virtue, INS Memorandum, 74 Interpreter Releases 795 (1997). "Facts do not cease to exist because they are ignored."—Aldous Huxley.

Relying on untrustworthy evidence, **8 U.S.C. § 1154(a)(1)(J), 8 C.F.R. § 204.2(c)(2)(iv),** and **61 Fed. Reg. 13,066** permit the defendants to arbitrarily decide, without the requirement of normal evidentiary standards, the credibility and weight of information provided by the accusers for finding Group A members responsible for "battery," "extreme cruelty," or an "overall pattern of violence"—all of which are referred to as "mistreatment" in this Opposition. Since evidence submitted by Group A is discarded, there is no adversarial process at work. The framers of the Constitution "did not trust any government to separate the true from the false for us." Thomas v. Collins, 323 U.S. 516, 545 (1945)(Jackson, J. concurring).

"Battery," "extreme cruelty," and "overall pattern of violence" are vague and overbroad terms. "Self-petitioning" under **8 U.S.C. § 1154(a)(1)(A)(iii)(I)(bb) & (II)(aa)(CC)(ccc)**, cancellation of removal under **8 U.S.C. § 1229b(b)(2)(A)(i) & (C)**, waiver of inadmissibility

under **8 U.S.C. § 1182(h)(1)(C) & (i)**, waiver of deportation under **8 U.S.C. § 1227(a)(1)(H)(ii)**, non-disclosure of information under **8 U.S.C. § 1367(a)(2)**, prohibition on evidence from U.S. citizens under **8 U.S.C. § 1367(a)(1)(A)**, and definitions under **8 U.S.C. § 1641(c)(1)(A)**, **8 C.F.R. § 204.2(c)(1)(vi)** and **61 Fed. Reg. 13,061, 13,065-066** all require Group A members to be guilty of "battering" or "extreme cruelty" or an "overall pattern of violence," but nowhere are those terms specifically defined.  Persons cannot know what not to do if there is no way of knowing what not to do.  ("Guilty" means responsibility for a crime or civil wrong.  <u>Black's Law Dictionary</u>, 8th ed. 1999, and is used interchangeably with "responsible" in this Opposition).

    <u>Bill of Attainder</u>.  The VAWA provisions were enacted knowing that they would punish without trial Group A members by violating their constitutional rights.  "The vice of attainder is that the legislature has decided for itself that certain persons possess certain characteristics and are therefore deserving of sanction…."  <u>U.S. V. Brown</u>, 381 U.S. 437, 449 n. 23 (1965).

    The Amended Complaint does <u>not</u> request, as the defendants misrepresent at Memorandum p. 1, that Group B members be required to obtain permanent residency by having their respective citizen husbands sponsor them.  Nor does the Amended Complaint request full access to the immigration records of Group B, only records concerning findings of mistreatment.

    The Amended Complaint charges that fundamental rights are violated by the <u>way</u> the defendants provide Group B members full permanent residency through the VAWA process.  Specifically, by the threshold requirement that Group A in some undefined manner mistreat Group B members.  The VAWA provisions and defendants ignore the adversarial system for determining the truth by finding mistreatment in secret proceedings that ignore evidence from the accused and consider information from accusers that has been vetted by Feminist counselors and profit-driven immigration attorneys as wholly trustworthy and persuasive.  The VAWA

provisions assume Group A members guilty without allowing them any opportunity to prove themselves innocent.  They've taken the "he said" out of the "he said, she said."

The fundamental rights at stake are fairness in procedure, freedom of choice in marital relations, freedom of speech, privacy, reputation as it relates to a state right, and freedom from invidious discrimination.

The defendants' key argument is that Group A members have not and will not suffer any injury from enforcement of the VAWA provisions.  The defendants also argue that because they must keep secret all the proceedings from Group A, its members cannot confirm that they are targets of the VAWA process.  By this logic, proceedings created by Congress and enforced by the Executive can make findings of fact against citizens, and those citizens cannot challenge the constitutionality of those proceedings because secrecy laws keep the proceedings hidden from them, regardless of what rights are violated in the process and what harms result.  A classic Catch 22, but fortunately, "[u]nder our written Constitution … the limitation of congressional authority is not solely a matter of legislative grace."  U.S. v. Morrison, 529 U.S. 598, 616 (2000)(citation omitted).

The VAWA provisions use the Federal Government to reshape social relations by coercing private conduct in accordance with the Feminist Establishment's ideology.[1]  The conduct regulated need not amount to criminal or civil wrongs, but even if it does, the prevention and punishment of such more appropriately falls within family law—an area traditionally reserved for the states.  See Morrison, 529 U.S. at 615-16.  The purported Federal interest of preventing Group A from mistreating Group B members is better served by the states' police

---

[1] Feminist Establishment refers to the unitary belief system held by a sufficient number of influential persons in this society such that the ideology of Feminism dominates over other beliefs in the political, governmental, academic, media and social spheres.

forces, family courts, legal aid societies, women's shelters and the numerous non-profit and tax-exempt organizations created to assist Group B.

## DIVORCE VAWA STYLE

The defendants falsely claim that prior to VAWA an alien "was entirely dependent on her husband to file an immigrant visa petition on her behalf," Memorandum p. 3, and such dependency led to citizens pressuring alien spouses to remain in marriages in which they were mistreated. The petition is a Joint Petition that the spouses together file for the alien to become a full permanent resident. 8 U.S.C. § 1186a(c). Prior to VAWA there were two procedures that allowed alien spouses to obtain full permanent residency without the aid of citizen spouses. The hardship waiver, 8 U.S.C. § 1186a(c)(4)(A), required the alien to make a showing of "extreme hardship," which would be difficult to meet. Gordon, Immigration Law & Proc., § 42.05(4)(b), p. 42-18. Another route was the marriage's legal termination, 8 U.S.C. § 1186a(c)(4)(B), not a difficult task in the era of "no-fault" divorces.

VAWA does much more than give Group B members an independent, redundant route to full permanent residency. It allows them to acquire full permanent residency and citizenship even when they are not of good moral character or engaged in marriage fraud. They can admit to crimes of moral turpitude or violating drug laws; be convicted twice with a total sentence of 5 or more years; worked as prostitutes; or used fraud to obtain admission to the U.S., providing in the fraud situation the aliens show that some hardship would result in denying them residency. 8 U.S.C. §§ 1182(a)(6)(C)(i) & (iii), **1182(h)(1)(C)** and **1227(a)(1)(H)(ii)**. VAWA also provides similar excuses for Group B to cancel deportation proceedings if they allege their citizen husbands made them do the above. **8 U.S.C. § 1229b(b)(2)(C)**. Ironically, the VAWA

5

provisions have pretty much negated the Government's policy of preventing marriage fraud under the Immigration Marriage Fraud Amendments of 1986, 8 U.S.C. 1186a.

## CLASS MEMBERS or GROUP A

The plaintiff class, or Group A, is <u>not</u> alleging "wrongs as a result of … marriage[s] to … alien [wives]." (Memorandum p. 6). The wrongs are the violation and continuing violation of the class members' constitutional rights by the defendants who execute the various VAWA provisions. The injuries to the class members are the violations of their constitutional rights and other harms that result from those violations.

The defendants object that some allegations are "upon information and belief." (<u>Id.</u>) The reason is that the defendants hide their activities behind close doors from Group A members but <u>not</u> Group B, certain feminist groups, or some government agencies. **8 U.S.C. § 1367(a)(2)**. Further, allegations on information and belief are permitted when the matters are peculiarly within the opponents' knowledge—in this case the defendants. <u>Luce v. Edelstein</u>, 802 F.2d 49, 54 n. 1 (2d Cir. 1986)(fraud allegations which require a higher standard of pleading than here).

Four named plaintiffs represent the plaintiff class or Group A. The pattern of facts and violation of their rights are common to all the class members: a U.S. citizen male (1) brings an alien female to America on a fiancée visa and marries her within 90 days; or (2) marries an alien female already in the U.S., whether she's here legally or illegally, and sponsors her for conditional permanent residency; or (3) marries an alien female overseas and brings her here on a conditional permanent residency visa. The citizen husband, after a period of time, realizes his wife married him just to obtain full permanent residency in the U.S.—a prize cherished around the world. Or the marriage just doesn't work out. The husband tells his alien wife he intends to divorce her, which will make the prize much more difficult to obtain unless she uses the VAWA

process of accusing her husband of mistreatment and she creates a paper trail of documents that the defendants consider "credible evidence."

Some foreign females, whether in the U.S. or overseas, learn about the VAWA process from the many Feminist groups on the Internet that explain exactly how to exploit the procedure. Many of these foreign females then target a citizen male for a fraudulent marriage. Other foreign females don't learn of VAWA until married to a citizen. Either way, when the marriage starts to unravel, Feminist organizations, funded by the Federal Government or granted tax-exempt status, intervene to provide free assistance to Group B members on the exact steps needed to take—or create—to assure winning the prize of full permanent residency and eventually citizenship.

Many of the specific facts pertaining to the named plaintiffs are spun by the defendants through deletions and misstatements to create a false picture of innocent alien wives but innately culpable and troublesome husbands. (Memorandum, pp 6-9). Culpability or vexation are not the issues in this case. The issues are whether the VAWA provisions and their enforcement violate the constitutional rights of Group A, thereby causing injury.

This Court is referred to the Amended Complaint at ¶¶ 53-125 for the accurate factual allegations concerning the class representatives.

## STANDING

The U.S. Supreme Court's practice is to sustain the jurisdiction of federal courts to issue injunctions and other relief to protect rights safeguarded by the Constitution and to restrain government officials from doing what the Constitution forbids the Government to do. Bell v. Hood, 327 U.S. 678, 684 (1946)(citations omitted). Interests and "values of an abstract nature or esoteric nature can provide the basis for standing," O'Hair v. White, 675 F.2d 680, 687 (5th Cir. 1982), such as the highly abstract rights to speech, association and equal protection, Wright, Fed.

Prac. & Proc. Supp., § 3531.4, at pp. 954-55 (2008).  Their importance and the protection of

individual constitutional rights is a central part of the role under separation of powers assigned to

the judiciary where "[t]he touchstone to justiciability is injury to a legally protected right …."

Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 140-41 (1951)(citations

omitted).  Injuries need only be alleged—not proven, and are deemed true on the defendants'

facial Rule 12(b)(1) motion.  Robinson v. Overseas Mil. Sales Corp., 21 F.3d 502, 507 (2d Cir.

1994)(citations omitted).  The alleged injuries in this case stem from what the Justice

Department ("DOJ") considers law enforcement proceedings, Exhibit 1, and include the threat of

future harm.  "Past wrongs are evidence bearing on whether there is a real and immediate threat

of repeated injury."  O'Shea v. Littleton, 414 U.S. 488, 496 (1974).  The Government is not about

to stop enforcing the VAWA provisions, which creates a certainty of future injuries to Group A

members.  At this very moment, some Group A members and at least two of the named plaintiffs

are having their rights violated by the defendants.  (Amended Complaint ¶¶ 14-24, 95, 125).

Procedural Due Process Violations

> "VAWA cases are pretty much a joke, most of them are approved because there is
> only one side.  There's a ring of groups that know what to tell the officials at the
> Vermont Service Center.  There's an extremely high approval for VAWA cases."
> Dean Hove former USCIS Upper Midwest Deputy District Director.

When the power of government is used against a person, there is a right to fair procedure

to determine the legality of the government's decision.  Due process requires the opportunity to

be heard "at a meaningful time and in a meaningful manner" before government burdens life,

liberty or property.  Armstrong v. Manzo, 380 U.S. 545, 552 (1965).  In determining what

process is due, the courts look to three factors:  (1) whether existing procedures create an

unreasonable risk of an erroneous deprivation, (2) the private interest affected by official action,

and (3) the Government's interest in the existing procedures.  Mathews v. Eldridge, 424 U.S.

319, 335 (1976).  When procedures limit fundamental constitutional rights, the laws creating

them must serve compelling governmental interests.  Rotunda, <u>Treatise on Constitutional Law</u>, §

15.7, 4th ed. 2008.

Three VAWA procedures violate procedural due process:  <u>Secrecy</u>, **8 U.S.C. §**

**1367(a)(2) & (c)**, provides <u>no</u> notice and <u>no</u> opportunity for Group A members to be heard at

proceedings that find them responsible for "battery," "extreme cruelty" or an "overall pattern of

violence;" and two evidentiary provisions referred to as <u>Turning a blind eye</u>, **8 U.S.C. §**

**1367(a)(1)(A)**, and <u>Relying on untrustworthy evidence</u>, **8 U.S.C. § 1154(a)(1)(J), 8 C.F.R. §**

**204.2(c)(2)(iv), and 61 Fed. Reg. 13,066**, ignore evidence from Group A but rely on

incompetent evidence from Group B.  All three corrupt the truth finding function and violate

fundamental constitutional rights in determining whether Group A mistreats Group B.

*Speech*  Where the reasonableness of the Government's decisions depend on findings of

fact, the evidence used to prove those findings must be disclosed to the adverse party so that he

can show the evidence untrue.  <u>Greene v. McElroy</u>, 360 U.S. 474, 496-97 (1959).  This is

especially important when the evidence consists of testimony by those who "might be perjurers

or … motivated by malice, vindictiveness, intolerance, prejudice or jealousy."  <u>Id.</u>  The secrecy

and evidentiary provisions prevent the accused from speaking or hiring attorneys to speak for

them or presenting oral and written evidence on their behalf.  It's commonly called "railroading."

*Marriage*  "Choices about marriage, family life, … are among associational rights [the

Supreme] Court has ranked as 'of basic importance in our society.'"  <u>M.L.B. v. S.L.J.</u>, 519 U.S.

102, 116 (1996)(citation omitted).  Group A members do not have the freedom of choice to

challenge the accusations and findings of marital mistreatment.  Nor can Group A choose to

submit Group B's use of the VAWA process as evidence of an alien's motivation for fraud in

restraining order, arrest and divorce proceedings. Group A members are boxed-in between two equally harmful alternatives: found guilty of domestic mistreatment by the Federal Government <u>or</u> perjury in sponsoring alien wives for residency. A dilemma that effectively chills Group A members' rights to choose to seek annulments or divorces.

_Privacy & Reputation_  The right to privacy protects one's private life from government intrusion, <u>Olmstead v. United States</u>, 277 U.S. 438, 478-79 (1928)(Brandeis, J. dissenting), and the right to privacy regarding family matters is inherent in the concept of liberty, Rotunda, <u>Treatise on Constitutional Law</u>, § 18.26, 4th ed. 2008. The VAWA provisions result in the wholesale intrusion by the defendants into private matters without any procedures for protecting the privacy rights of Group A members.

Government harm to reputation in connection with the denial of a right recognized by state law infringes a liberty interest that triggers due process. <u>Neu v. Corcoran</u>, 869 F.2d 662, 669-670, & n. 2 (2d Cir. 1989). VAWA provisions prevent Group A from preventing or correcting false findings by the defendants that are defamatory. The defamations are available to certain Federal, State and local employees, private organizations providing benefits and "victim's service[s]," and law enforcement officials. **8 U.S.C. § 1367(b)(2)(4)(5) & (7)**. Since the defamatory statements are made in official proceedings and constitute an accurate depiction of those proceedings, the statements are privileged under state law in defamation actions. _E.g._, <u>Andrews v. Gardiner</u>, 224 N.Y. 440, 446, 121 N.E. 341, 343 (1918); N.Y. Civil Rights Law § 74. The result is that the one-sided, secret VAWA proceedings eliminate the right to a state cause of action for defamation brought by Group A members.

The Alice in Wonderland nature of the VAWA determination of mistreatment is best illustrated by **8 U.S.C. § 1367(a)(1)(A)**. Defendants cannot make any decisions to find Group B

10

inadmissible or deportable solely from information provided by Group A members who have mistreated their alien spouses.  The threshold question is whether Group A mistreated Group B. The defendants, however, cannot accept any evidence from Group A as to innocence because such evidence may result in findings of <u>no</u> mistreatment, which means self-petitioners are ineligible under VAWA.  And VAWA ineligibility means Group B members would be inadmissible or deportable as a result of evidence solely from Group A, which the law forbids. So to conform to the statute, Group A members are presumed guilty and denied any opportunity to show otherwise.  That is no way to find the truth, but it is in the tradition of every kangaroo trial, witch-hunt or "French Reign of Terror" proceeding that ever occurred.

  <u>*Government's Interest*</u>  The defendants represent the Government's interest as preventing "accused batterers" of participating in the VAWA process so as to "ensure the effectiveness of the application procedures."  (Memorandum p. 5).  The focus of those procedures is determining whether Group A members mistreated members in Group B.  The same objective can be served without the wholesale violation of the rights of Group A by providing those procedures of the adversarial process that convince the governed that "justice has been done," <u>Joint Anti-Fascist Refugee Committee v. McGrath</u>, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring).  "The validity and moral authority of a conclusion largely depend on the mode by which it was reached.  Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness."  <u>Id.</u> at 171.

<u>Injuries from Procedural Due Process Violations</u>

  The denial of procedural due process in proceedings that impact fundamental constitutional rights injure Group A members in personal and individual ways.  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 n. 1 (1992).  The basic interest in notice and

opportunity to be heard supports standing:  a plaintiff is even entitled to nominal damages on a showing of a deprivation of procedural due process without any other actual injury because of the importance to organized society that procedural due process be observed.  <u>Carey v. Piphus</u>, 435 U.S. 247, 266 (1978).  The defendants' Rule 12(b)(1) motion claims "none of the named plaintiffs can confirm that his ex-wife actually filed any application under VAWA," Memorandum p. 17, so any violations of their procedural due process rights is "conjecture."  But the Amended Complaint at ¶ 110 states that Mr. Cardozo's alien wife "used VAWA to acquire permanent residency," and the Cardozo Affidavit confirms that, <u>Exhibit 2</u>.  The three other co-representatives allege their ex-wives used, are using or will use VAWA.

Lack of procedural due process infringes speech by Group A, but not by prosecuting or punishing speech after it occurs, Memorandum p. 22, rather by preventing speech before it occurs—censorship.

The VAWA provisions create on going risks that effectively limit freedom of choice in not only whom to marry but whether to terminate a marriage.  Group A members cannot divorce without the risk of being subjected to special disabilities created by the provisions, which means they have a substantial, immediate, and real interest in whether the provisions are valid.  *See* <u>Evers v. Dwyer</u>, 358 U.S. 202, 204 (1958).  VAWA secrecy prevents Group A from using Federal records to reopen state criminal and civil cases or defend against current actions by showing that accusations by Group B lack credibility because such claims are driven by the prize of full permanent residency.

When citizen men bring alien fiancées to America for marriage or sponsor their alien wives for conditional permanent residency, they must enter into contracts with the Federal Government, USCIS form I-864.  8 U.S.C. § 1183a.  The enforceable agreement obligates Group

A to support Group B to the amount of 125% of the poverty level if alien wives receive public assistance.  These obligations may last for 10 years and divorce does not end them.  Findings by the Government that alien wives are inadmissible or deportable will end the husband's obligation, since the wives will no longer be in the U.S. legally.  The VAWA provisions, however, provide waivers for conduct that would normally result in inadmissibility or deportability, 8 U.S.C. §§ 1182(h), 1227(a)(1)(H) and 1229b(b)(2); thereby assuring that alien wives legally remain in the U.S. and the husbands obligated to support them.

Many members of Group A use or will use K-1 fiancée visas to bring their future foreign wives to America.  An amendment to VAWA limits citizen husbands to sponsoring just two such visas unless a waiver is obtained.  8 USCS § 1184(d); Memorandum USCIS, HQOPRD 70/6.2.11.  An obvious factor in considering a waiver is whether a prior alien wife was adjudged inadmissible or deportable, but the VAWA provisions effectively prevent that.  So those who are unlucky in marriage to aliens are effectively limited to two K-1 fiancées, while those who seek only domestic spouses still have the freedom to marry as often as they wish.

The VAWA process casts a continuing and brooding presence of risk and fear that threatens an American man's right to marry an alien female when considering the high failure rate of marriages, the intense desire of aliens to gain admission to the U.S., and that marriage is fundamental to the very existence and survival of mankind, Skinner v. Oklahoma, 316 U.S. 535, 541 (1942).  Such risks are sufficient for standing, Cronin v, FAA, 73 F.3d 1126, 1130 (D.C.Cir. 1996) and also deter Group A members from again marrying aliens.

Privacy and reputation injuries derive directly from unexpired and unretracted government action, which satisfies standing.  See Foretich v. United States, 351 F.3d 1198, 1213 (2003).  DOJ considers the fact-findings in the VAWA process as compiled for law enforcement

purposes and cannot be released without constituting an "unwarranted invasion of the personal privacy of third parties" under 5 U.S.C. § 552(b)(7)(C). Exhibit 1. Yet, it is highly likely that privacy and defamatory information concerning Group A will be communicated to government or private providers of benefits to Group B because 8 U.S.C. § 1641(c) requires the providers to verify information by accessing the defendants' findings. Such disclosures constitute publication to third parties and create the risk of even wider publication.[2] (Amended Complaint ¶¶ 21-24, 148-49, 151-55, 203). The likelihood of disclosure suffices for standing. *See* Bryant v. Yellen, 447 U.S. 352, 366-67 (1980). Further, the likelihood of wider disclosure is significantly greater than the likelihood of a nuclear accident for which the Supreme Court found standing in Duke Power Co, v. Carolina Envtl. Study Group, Inc., 438 U.S. 59, 64, 69 (1978).

Additional reputation harm is based on Valmonte v. Bane, 18 F.3d 992 (2d Cir. 1994), where the Second Circuit found specific deprivation of plaintiff's opportunity to seek employment caused by a statutory impediment established by government. In Valmonte, the state determined persons were child abusers without proper due process and kept their names in a registry unavailable to the general public. If such a person applied for employment in childcare, the potential employer had to check the registry, which would result in denial of a job. The person denied the job had to be told whether it was based on the registry. Under VAWA, Group A members applying for employment with the Federal Government that requires a security clearance will have their VAWA records checked by the FBI, which will result in a denial. But any denial will remain secret, since disclosure to Group A is prohibited. Infringement of opportunity to work for the Government is punishment of a most server type. U.S. v. Lovett, 328

---

[2] Counsel for the class has requested statistics on the release of such records. The F.O.I.A. request is pending with USCIS and on appeal with EOIR.

U.S. 303, 315 (1946). In <u>Valmonte</u> the process allowed for notifications and appeal procedures, but was still found to create an "enormous risk of error" resulting in loss of employment. <u>Valmonte</u>, 18 F.3d at 1003. The VAWA provisions provide <u>no</u> procedures.

Under VAWA "credible evidence" means whatever the defendants decide it to mean. **8 U.S.C. § 1154(a)(1)(J), 8 C.F.R. § 204.2(c)(2)(iv), 61 Fed. Reg. 13,066,** and Virtue, <u>INS Memorandum</u>, 76 Interpreter Releases 162, 168-169 (Jan 25, 1999). The defendants have no clear cut standards for determining credible evidence while the only discernible rule for allocating weight is that court documents, medical reports, police reports, and other official documents will receive more weight than documents created by Group B. <u>Id.</u>, Virtue. VAWA has confused authentication of official documents with the truth of the matters asserted. All too often falsehoods are inserted into court documents submitted by parties, lies told to medical personnel, and misrepresentations made to the police. Giving additional weight to the contents of such documents is bootstrapping, since the source of information mainly comes from Group B. The evidentiary benefits of such documents are not lost on immigration lawyers, Feminist groups (some of which advise withholding information from the police and courts) and Group B members. They intentionally create a trail of official documents filled with false charges against Group A so that those documents can be used as "primary evidence" in the VAWA process. Of course, another very foreseeable result is that the false charges will result in jail, temporary restraining orders, harm to occupation, lost of employment, legal fees, and pink-listing, which is similar to the blacklists of the McCarthy era. As back then, lives are destroyed based on unsubstantiated accusations.

The anticipation of future injury itself can provide standing when persons reasonably suffer fear of the risks they cannot do anything to lessen. <u>N.Y.P.I.R.G. v.Whitman</u>, 321 F.3d

316, 325-26 (2d Cir. 2003). Group A members have no legal recourse, other than this lawsuit, to prevent the violation of their due process rights when the VAWA process deprives them of free speech and freedom of choice in marital decisions or invades their privacy or injures their reputation. The information held by the defendants is a ticking time bomb.

Equal Protection Violations

The VAWA provisions classify persons so as to prevent the exercise of fundamental rights on equal terms: (1) Americans v. different nationalities, (2) U.S. citizens v. non-permanent aliens, and (3) males v. females. "[W]here fundamental rights and liberties are asserted under … Equal Protection … classifications which might invade or restrain them must be closely scrutinized and carefully confined. Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 670 (1966); Zablocki v. Redhail, 434 U.S. 374, 388 (1978).

*Nationality & Alienage:* Nationality arises from a person belonging to a nation. Alienage means a foreign born person who has not yet qualified for citizenship. The aliens concerned with in this action are non-permanent; that is, not full permanent residents. Nationality and alienage are two different classifications but both are suspect. Frontiero v. Richardson, 411 U.S. 677, 682 (1973)(citations omitted).

The VAWA provisions aim to keep American citizens who mistreat their non-American, alien spouses from opposing a spouse's application for full permanent residency. (Memorandum p. 5). The defendants, therefore, must find American citizens guilty of mistreating their spouses. It is in reaching these findings that the defendants treat American citizens differently than non-American, non-permanent aliens. The aliens know about the proceedings and can submit evidence—the citizens are shutout. VAWA's classifications do not remotely serve the end of truthfully determining mistreatment because participation and evidence from citizens are lacking

16

due to their American nationality and citizenship.  The denial of fundamental rights to American citizens but allowed to non-American aliens is so disconnected with finding the truth that the provisions are inexplicable by any motive other than animus toward American citizens, mainly men, who marry foreigners.  The provisions, therefore, violate equal protection.  *See* Zablocki, 434 U.S. at 388-89.

The defendants focus on the "citizen v. alien" distinction and argue that the Government can deprive citizens of fundamental rights while giving those same rights to non-permanent aliens because citizens are <u>not</u> similarly situated with aliens.  (Memorandum p. 23).  Long ago the U.S. Supreme Court found that rights to equal protection "are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences …." <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 369 (1886).  The Constitution "neither knows nor tolerates classes among citizens," <u>Plessey v. Ferguson</u>, 163 U.S. 537, 559 (1896)(Harlan, J. dissenting).  Those words are now understood to state a commitment to the law's neutrality where the rights of persons are at stake, whether citizens, legal or illegal aliens.  <u>Romer v. Evans</u>, 517 U.S. 620, 623 (1996).  How ironic that today, America, which has consistently granted aliens within its borders rights similar to U.S. citizens, now deprives those citizens of rights granted aliens.  The Constitution does <u>not</u> allow for such; if anything, citizens have more rights.  *See* <u>Bernal v. Fainter</u>, 467 U.S. 216, 221 (1984).

*Sex:*  The Congressional history of VAWA is not sex-neutral but shows a motivation to burden men, and the challenged provisions are presently applied disproportionately against men.  The purpose of an act must be found in its natural operation and effect, <u>Truax v. Raich</u>, 239 U.S. 33, 40 (1915)(citations omitted), and the purpose of VAWA is not only plainly shown by its history, but frankly revealed in its title:  The Violence Against Women Act.

Congress's goal in passing VAWA was to protect "immigrant women," from citizen men, Hernandez v. Ashcroft, 345 F.3d 824, 827, 840-41 (9th Cir. 2003); H.R, Rep. No. 103-395, at 25. The Congressional history and Government documents reflect a belief in traditional stereotype distinctions between the sexes that identify females as innocent victims and males as batterers. Baskerville, Family Violence in America, p. 21 (2006)(domestic violence is perpetrated as often by women as men, n. 44). Congress used the term "women" as the intended beneficiaries of the Act, and not until 2005 did the statute, first enacted in 1994 and repeatedly amended, specifically include men as beneficiaries rather than the culprits the legislative history reflects. VAWA's original enactment, as evinced by the terminology used and viewed in the backdrop of prevalent ill will toward men held by the Feminist lobbyists who created the Act, shows it was at least partially motivated by bias against men. The Act continues to this day to have that effect, so it violates equal protection. *See* Hunter v. Underwood, 471 U.S. 222, 233 (1985).

Laws might not have sex classifications written in words, but they may be applied in such a way as to create classifications. *See* Yick Wo v. Hopkins, 118 U.S. at 373-74. The Amended Complaint alleges at ¶¶ 126-39 the discriminatory application of the law by the VAWA Unit at the USCIS Vermont Service Center. Further, as Gordon's treatise on Immigration Law and Procedure, § 41.05(1) and feminist advocates, such as Gail Pendleton of the National Immigration Project, make clear: it is primarily alien wives who use the VAWA process and for whom the process was intended. DOJ's Office on Violence Against Women, which administers VAWA funds, instructed the Delaware Domestic Violence coordinating council that "states must fund only programs that focus on violence against women"; the victims served under VAWA programs are 90% female; DOJ's National Institute of Justice specifically prohibits "proposals for research on intimate partner violence against … males of any age," and requires that

"[s]trategies for preventing intimate partner violence should focus on risks posed by men," July 2000, NCJ 181867.  These are just some of the many examples of the discriminatory application of VAWA against men as detailed by R.A.D.A.R. in <u>VAWA Programs Discriminate Against Male Victims</u>, Dec. 2007, www.mediaradar.org.  VAWA is presently a device used to impose burdens primarily on males rather than females.

<u>Injury from Equal Protection Violations</u>

The Amended Complaint claims the Government erected and defendants enforce unconstitutional barriers—secrecy, evidentiary, and arbitrary definitions—that make it impossible for Group A to obtain the same benefits of procedures in defending against accusations as Group B members have in prosecuting those accusations.  The injury is in <u>not</u> being considered equally without the discriminatory obstacles, and causality exists because plaintiffs are able and ready to defend against the accusations but the VAWA provisions prevent them.  <u>Northeastern Fla. Assoc. Gen. Contractors Am. v. Jacksonville</u>, 508 U.S. 656, 666 (1993).  In other words, Group A cannot compete on an equal footing with Group B in the mistreatment determinations.  The remedy is restoring equality, which can occur by withdrawing the benefits of procedures from the favored class, Group B, or extending the same procedures to the excluded class, Group A.  <u>Heckler v. Mathews</u>, 465 U.S. 728, 740 (1984)(citation omitted).

The current climate in America in which family courts believe wives but not husbands compounds the harm to citizen husbands from the VAWA provisions.  The challenged provisions drafted by Feminist organizations are clearly ingenious.  They exploit a society biased against men when up against their wives—not wholly unlike the societal bigotry that led to the decision in <u>Plessy v. Ferguson</u>, 163 U.S. 537.  Today, men are stereotyped as the ones most

likely to resort to physical violence in a domestic dispute when actually it is the female.

American Journal of Public Health, May 2007, Vol. 97, No. 5, pp. 941-47.

Overbroad and Vague and Injury

Enactments are facially overbroad when their reach is so sweeping that they could deter persons from engaging in protected speech, Broadrick v. Okla., 413 U.S. 601, 612 (1973), and void for vagueness when "men of common intelligence must necessarily guess at [their] meaning[s] and differ as to [their] applications," Connolly v. General Constr. Co., 269 U.S. 385, 391 (1926). Expansive scope and uncertain meanings inevitably lead citizens to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked" and "delegate basic policy matters to [government employees] for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972)(citations omitted).

The VAWA process requires that Group A members engage in "battering" or "extreme cruelty" or an "overall pattern of violence." (Amended Complaint ¶¶ 188-204). These terms, however, are open-ended and nebulous. Battery includes anything from plaintiffs kissing their alien wives when they don't want to be kissed to felonious physical injury. *See* **61 Fed. Reg. 13,066**. Extreme cruelty includes the verbal infliction of emotional distress without any physical manifestations, verbal and other acts against third parties, and behaviors, including speech, intended to control and exercise power over Group B. Pendleton, Immigration and Nationality Law Handbook, p. 2, n. 5, p. 6, ed. 2001-02. Overall pattern of violence, which is a catch-all provision, includes "name calling," "criticizing, insulting, belittling," "false accusations," "blaming," "ridiculing," "lying," "calling [wife] sexually degrading names," "comments about women's bodies," "accusing [wife] of having a lover," "reminding [wife] of her duties,"

20

"threatening to leave [wife]," "calling [wife] to make sure she is okay," etc.  DOJ funded studies: 1999 National Victim Assistance Academy, chap. 8; Family Violence Prevention Fund, Breaking the Silence - Training Manual, pp 55-58 (2006).

The words used by Group A that rise to the level of mistreatment include protected and unprotected speech and afford little, if any, opportunity to avoid a finding of mistreatment.  The intentional vagueness and expansiveness of the terminology trap the innocent by not providing fair warning, allow for arbitrary and discriminatory enforcement, and inhibit the exercise of basic First Amendment rights.  Grayned, 408 U.S. at 108-09.  Any marital quarrel or effort to make-up in which Group A members dare open their mouths can and will be held against them by the defendants, so they remain silent—an injury of censorship.

Bill of Attainder and Injury

U.S. Const. I. § 9 cl. 3 prohibits acts of Congress "that apply to … easily ascertainable members of a group in such a way as to inflict punishment…" without the safeguards of a trial. U.S. v. Lovett, 328 U.S. at 315.  The severity of the punishment is irrelevant, U.S. v. Brown, 381 U.S. at 447, and "[t]he deprivation of any rights, civil or political previously enjoyed, may be punishment…," Cummings v. Missouri, 4 Wall. 277, 320 (1867).

State secrecy, taking evidence from one side, and amorphous and arbitrary definitions of mistreatment all injure Group A by depriving rights and all maximize the chances of finding Group A members guilty as punishment for marrying aliens.  Mistreatment of alien wives can just as well be handled by allowing due process and equality of opportunity for Group A.

The fact that the punishments are inflicted through the instrumentality of immigration proceedings make them no less galling, effective or invalid than if they had been done by an Act of Congress designating mere allegations of mistreatment by Group B and others in their corners

21

as actual proof of criminal and civil wrongs.  *Cf.* Lovett, 328 U.S. at 316.  "Those who wrote our

Constitution well knew the danger inherent in special legislative acts which take away the life,

liberty or property of particular … persons, because the legislature thinks them guilty of conduct

which deserves punishment."  Lovett, 328 U.S. at 317.

Causation and Remedies of Injuries

 Standing causation requires that the asserted injuries are the consequences of or fairly

traceable to the defendants' actions.  Duke Power Co, v. Carolina Envtl. Study Group, Inc., 438

U.S. 59, 72 (citations omitted).  The VAWA provisions are the instruments of harm for without

them there would be no secrecy, incompetent and ignored evidence, arbitrary definitions of

mistreatment, disclosure of private matters and unchallenged falsehoods, and the violations of

rights.

 The causal connection can also result from action by third parties because fairly traceable

injuries do not require the defendants' actions to be the last step in the chain of causation,

Bennett v. Spear, 520 U.S. 154, 168-69 (1997), and it matters not whether that last step is a

discretionary decision, *see* F.E.C. v. Akins, 524 U.S. 11, 25 (1998), for standing can be based on

a prediction that remedial benefits will flow from nonparties behavior in response to a decision,

Duke Power Co., 438 U.S. at 74-75.  The VAWA provisions lead to fraudulent police

complaints, arrests, and temporary restraining orders against Group A in order for Group B to

have official documents for gaining full permanent residency.  Finding the provisions

unconstitutional would minimize fraud by increasing the chances of defrauders being caught.

 Causation is also satisfied by showing there is a substantial likelihood that the requested

relief will redress the injuries.  Duke Power Co., 438 U.S. at 75 n. 20.  The defendants'

memorandum misstates and leaves out pertinent sections of the relief sought in an effort to

diminish the likelihood that the requested remedies will rectify the injuries.  The Amended

Complaint at ¶ 219 rather than the Defendants' Memorandum at pp 12-13 should be used for an

accurate representation of what the class requests:  nominal damages for past injuries;

invalidating and enjoining the operation of the VAWA provisions (the traditional method for

enforcing personal constitutional rights, Wright, Fed. Prac. & Proc. Supp., § 3531.6, pp 1191-92

(2008); access to records holding Group A members guilty of mistreatment and a fair means,

similar with the Privacy Act 5 U.S.C. 552a(d), to correct those records; specific and limited

definitions of mistreatment; and procedures for preventing the disclosure of private and false

information about Group A.  Such remedies will prevent or at least alleviated the injuries caused

by the VAWA provisions.  *See* Massachusetts v. EPA, 127 S. Ct. 1438, 1458 (2007)(some

measure of relief suffices).

Finally, the line of causation in this case is more traceable than in Duke Power Co., 438

U.S. at 74-75 or United States v. SCRAP, 412 U.S. 669, 688-90 (1973).

## RULE 12(b)(6)

Rule 12(b)(6) requires the plaintiff class to provide the grounds on which its claims rest

through factual allegations sufficient "to raise a right to relief above the speculative level." ATSI

Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)(citing Bell Atl. Corp. v.

Twombly, 127 S.Ct. 1955, 1965 (2007)).  To do so, a complaint should place allegations in a

context that raises suggestions of facts required for a cause of action, Bell Atl. Corp., 127 S. Ct.

at 1966, and may achieve this through either direct or inferential allegations as to all the material

elements of a legal theory, Bell Atl. Corp. at 1969.  In civil rights actions concerning

discrimination, as in the case before this Court, it is enough to assert facts and reasonable

23

inferences so that when construing the complaint liberally and in the plaintiff class's favor, a court could infer a violation.  *See* Gregory v. Daly, 243 F.3d 687, 692 (2d Cir. 2001).

When the Amended Complaint's factual allegations pertaining to Group A are considered in relation to the extensive reach of the VAWA process into personal lives, the barred doors behind which the defendants find citizens guilty, and the inappropriate influence exerted by a powerful special interest group in creating and executing the process, valid inferences result that the class representatives and thousands of citizen men have, are having and will have their rights violated.

A fair reading of the Amended Complaint will show the defendants' objections baseless: bald spots grow hair, specters of speculation are exorcised, reality supplants opinions, content holds sway over labels, formulaic recitations are adapted and legal conclusions are unmasked to reveal factual bases.  Some facts are on information and belief, but all going to the elements of the violations of Group A members' rights to freedom of speech, privacy, freedom of choice in marital relationships, procedural due process, equal protection and right of access to deportation proceedings.  The Amended Complaint gives the defendants fair notice of what the claims are and the grounds upon which they rest.  Bell Atl. Corp., 127 S.Ct. at 1964-65.

Defendants' cite to Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007), is misplaced because that Court found the plaintiff pled no facts alleging the defendants' acts were for an anticompetitive purpose.  The Amended Complaint is not lacking in factual allegations of constitutional violations and harm.  As for prohibitions on "bald conclusory statements" of Goldfine v. Sichenzia, 118 F.Supp. 2d 392, 396-97 (S.D.N.Y. 2000) and "legal conclusions, deductions, or opinions" of L'Europeene de Banque v. La Republica de Venezuela,

700 F. Supp. 114, 122 (S.D.N.Y. 1988), the defendants cite to no such examples in the Amended Complaint—they just make a blanket criticism.

Some legal conclusions, however, are permissible when the defendants are given notice of the date, time and place of the alleged illegal conduct.  Iqbal v. Hasty, 490 F.3d 143, 156 (2d Cir. 2007).  In this case, the defendants already have notice for they are the ones conducting the secret proceedings.  If the defendants have any questions as to who, what, where, and when their alleged acts occurred, they can simply look to their own employees, and if they want more information on the harm they have caused Group A members, they can make a motion for a more definite statement, or tightly controlled reciprocal discovery.  Iqbal, 490 F.3d at 158.

## CONCLUSION

The British Star Chamber acted as a court that imposed punishment for actions deemed to be morally unacceptable but not in violation of the law.  This allowed the Chamber to punish anyone for any action that the Chamber felt should be illegal even when it wasn't.  The Chamber's decisions were arbitrary and subjective which allowed it to become an instrument of oppression.  Hearings held in secret, no indictments, no appeals, no juries.  With each embarrassment to arbitrary power, the Star Chamber became emboldened to undertake further usurpation.  It spread terror among those who did constitutional acts.

American men don't mind putting up with a fair number of demands:  empty the garbage, rake the leaves, take me to dinner, buy me a fur coat—but when wives and the Government violate their rights in proceedings out of the Middle Ages, that goes a little too far.

_____/S/_____
Roy Den Hollander, Esq. (1957)
Attorney and co-plaintiff
545 East 14 Street, 10D
New York, N.Y. 10009
(917) 687 0652

**U.S. Department of Justice**

Office of Information and Privacy

Telephone: (202) 514-3642                    Washington, D.C. 20530

APR 2 3 2008

Mr. Roy Den Hollander
Apartment 10D                         Re:    Appeal No. 08-0918
545 East 14th Street                         Request No. 2008-3783
New York, NY 10009                           ALB:KMR

Dear Mr. Hollander:

You appealed from the action of the Executive Office for Immigration Review (EOIR) on your request for access to records pertaining to yourself, to include certain records pertaining to "Alina (a.k.a. Angelina) Alexandrovna Shipilina (a.k.a. Chipilina)."

After carefully considering your appeal, I am affirming, on partly modified grounds, EOIR's action on your request. EOIR properly withheld this information in its entirety because it is protected from disclosure under the Freedom of Information Act pursuant to 5 U.S.C. § 552(b)(7)(C). This provision concerns records or information compiled for law enforcement purposes the release of which could reasonably be expected to constitute an unwarranted invasion of the personal privacy of third parties.

In your letter dated January 26, 2008, you state that you are "requesting a determination of [your] Privacy Act request based on the Privacy Act and not the FOIA." Please be advised that the Privacy Act provides an individual with a means of access to his own records that are maintained in Privacy Act systems of records. See 5 U.S.C. § 552a(d)(1) (2007). EOIR informed a member of my staff that it could locate no records responsive to your request contained in a Privacy Act system of records. See 5 U.S.C. § 552a(a)(5) (2007) (defining a Privacy Act "system of records" as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual"). I have determined that EOIR's response was correct and that it conducted an adequate, reasonable search for records responsive to your request.

-2-

If you are dissatisfied with my action on your appeal, you may file a lawsuit in accordance with 5 U.S.C. § 552(a)(4)(B).

Sincerely,

Janice Galli McLeod
Associate Director

By: *Anne D. Work*

Anne D. Work
Deputy Chief
Administrative Appeals Staff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
Roy Den Hollander, Sean Moffett, Bruce Cardozo, and
David Brannon,

               Plaintiffs on behalf of themselves
               and all others similarly situated,

       -against-

Secretary Michael Chertoff U.S. Dept. Homeland Security,
Director Emilio Gonzales U.S. Citizenship and Immigration Services
     (formerly Immigration and Naturalization Service),
U.S. Attorney General Michael B. Mukasey,
Director Kevin Ohlson Executive Office for Immigration Review
     U.S. Department of Justice,

               Defendants.
-----------------------------------------------------------------------x

Docket No.
08 CV 01521(WHP)(ECF)

**AFFIDAVIT OF**
**BRUCE CARDOZO**

STATE OF CALIFORNIA    )
                         ) ss:
COUNTY OF LOS ANGELES  )

I, Bruce Cardozo, being duly sworn, depose and say:

1. I am a co-named plaintiff in the above captioned action.

2. In May 2002 at a divorce hearing, my attorney, Alan Chappell, after discussing the case with my wife's attorney, told me "Yes, it is true. She [my wife] filed an I-360 to get her permanent residency through domestic violence."

3. The alleged "battered spouse" classification is the only classification for which my wife could use a U.S. Citizenship and Immigration Services I-360 form.

4.  At a hearing on whether my alien wife would receive a renewed permanent restraining

order against me, my wife's attorney stated in court that my wife had received her

permanent residency.

Sworn to before me on this
___ day of August 2008

Bruce Cardozo

Notary Public



ROSEMARY V. ROSALES
Commission # 1799561
Notary Public - California
Los Angeles County
My Comm. Expires May 31, 2012

2